[No. 14996.   Department Two. — August 14, 1893.]

## THOMAS C. HOGAN, RESPONDENT, v. PACIFIC ENDOWMENT LEAGUE, APPELLANT.

ENDOWMENT ASSOCIATION — CONTRACTS — REMEDY FOR BREACH. — An unincorporated endowment association is the creature of contract, and must be governed by the law of contracts, and the obligations of its contracts for the payment of money, or for the security of any other right of property, are as sacred as those of any other contract, and a breach thereof will be remedied by the courts.

ID. — ARTICLES OF ASSOCIATION — FUNDAMENTAL LAW — VALIDITY OF AMENDMENTS — UNANIMOUS CONSENT. — The written articles of association of an unincorporated endowment league constitute a contract by which the duties of its officers and members and the scope of its business are to be regulated, and bear to it the same relation that a charter bears to an incorporated society, and constitutes its fundamental law, in accordance with which all subsequent by-laws, regulations, and amendments must be made, and no change or amendment can be made to impair the obligation of the original contract without the consent of all the members to be affected thereby.

ID. — AMENDMENT TO EQUALIZE PAYMENTS. — The fact that the articles of association constituting the contract do not operate equally upon the individual members, confers no authority upon the directors to change or amend the articles for the purpose of "equalization of payments," or other burdens imposed by the original compact, otherwise than authorized by the original articles.

ID. — POWER TO ENACT LAWS — CONSTRUCTION OF ARTICLE — LIMITATION OF POWER. — An article conferring upon the board of directors the power "to enact laws for the government of the league must be understood as limiting the power by the laws of the land with reference to which the article must be construed, and does not imply consent of all the members for the enactment of laws impairing the obligation of the contract embodied in the original articles.

ID. — CONTRACT TO PAY COUPONS — UNAUTHORIZED CHANGE OF BY-LAWS. — Where the original articles of association provided that coupons issued by the Endowment League should be paid on the day they matured by warrant on the treasurer, upon surrender of the coupons, the directors were not authorized to modify or annul this provision by changes in the by-laws, providing that the dues for the quarter and all assessments levied for the month in which the coupons are payable must first be paid before the coupons are payable, and providing for an impairment of the endowment fund from which coupons are payable by creating reserve and emergency funds to be taken out of the endowment fund.

ID.— INVALID LEVY OF ASSESSMENTS—ANTICIPATED LOSSES—GOOD STANDING OF MEMBER—ENFORCEMENT OF COUPONS.—The levy of numerous unnecessary assessments in the month in which a coupon is payable under the original articles, where there was sufficient money in the endowment fund provided for by these articles to pay all coupons then maturing, is not authorized by a provision of the original articles allowing assessments when the demands on the endowment fund require additional assessments; nor can such assessments be made to provide for future anticipated losses where there was no provision therefor in the articles of association, and such unauthorized assessments are invalid; nor can the refusal of the owner of a maturing coupon to pay them have the effect of suspending him from good standing as a member of the league, or to prevent the enforcement of the payment of his coupon.

ID.— MINISTERIAL ACTION OF DIRECTORS— NO PRESUMPTION OF LEGALITY OF ASSESSMENTS.—In levying assessments the directors act ministerially and not judicially, and no presumption arises in favor of their legality.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.

The facts are stated in the opinion.

*Eugene N. Deuprey*, for Appellant.

Individuals who form themselves into a voluntary association may agree to be governed by such rules as they see fit to adopt so long as they are not in contravention of the law of the land. (See note to *Austin* v. *Searing*, 69 Am. Dec. 672; *White* v. *Brownell*, 2 Daly, 329, 359; 4 Abb. Pr. N. S. 162, 193; *Hyde* v. *Woods*, 2 Sawy. 655, 659.) A member thereof is bound by all such rules to which he has assented, found in the constitution or by-laws of the association, and his duties, rights, and privileges as a member are measured by them. (*Hyde* v. *Woods*, 2 Sawy. 655, 659, affirmed in 94 U. S. 523; *Belton* v. *Hatch*, 109 N. Y. 593; 4 Am. St. Rep. 495; *Robinson* v. *Yates City Lodge*, 86 Ill. 598, 599; *Dawkins* v. *Antrobus*, Law. R. 17 Ch. D. 615.) Courts have no visitorial powers over the rules of a voluntary association as they have over a corporation, and cannot determine whether they are reasonable or unreasonable. (Hirschl on Fraternal Societies, 63; Niblack on Mutual Benefit Societies, sec. 25; *Austin* v. *Searing*, 69 Am. Dec. 673, note. See *Kehlunbeck* v. *Norddeutcher Bund*, 10 Daly, 447; *Harrington* v. *Workingmen's Benevolent Ass'n*, 70 Ga. 340.) When a member joins an association he is presumed to know and assent to its rules. (*Austin* v. *Searing*, 16 N. Y. 112; 69 Am.

Dec. 665; *White* v. *Brownell,* 2 Daly, 329; 4 Abb. Pr. N. S. 162.) A member is bound by a change in the rules made in accordance with existing rules. (*Poultney* v. *Bachman,* 31 Hun, 49; *Austin* v. *Searing,* 69 Am. Dec. 673, note.)

*George D. Collins,* for Respondent.

The law governing private corporations applies to voluntary unincorporated societies. (*Otto* v. *Journeymen etc. Union,* 75 Cal. 313, 314; 7 Am. St. Rep. 156.'

VANCLIEF, C. — The following is a copy of the complaint in this action :—

"The plaintiff in the above-entitled action complains of the defendant therein, and for cause of action alleges:—

"1. That said defendant is a voluntary and unincorporated association of a very large number of persons, and has for its object the payment of endowments in the sum of $500 at certain periods, computed according to the age of the member, until the aggregate payments to each member amount to the sum of $5,000.

"That said sums of $500 are paid to the members out of a fund created for that special purpose, and held by defendant in trust for the purpose of said payment. That said fund is designated the 'endowment fund,' and is composed of the proceeds from assessments levied upon the members to meet the payment of said endowment of $500 as the same becomes due, and is also composed of fines levied for non-payment of said assessments and the accumulation of interests derived from investments of said assessments when collected.

"That said assessments and fines are levied by said defendant upon its members.

"That at all the times hereinafter mentioned, the persons composing the said association transacted the business thereof at said city and county of San Francisco, under the common name of 'Pacific Endowment League,' and made and executed all business concerning the same in, under, and by said name.

"That heretofore, to wit, during the year 1888, and prior to August of that year, this plaintiff was admitted to membership in said defendant association, and did join the same and

thereby became a member thereof in good standing, and has continuously ever since been a member of said defendant association, in good standing therein.

"2. That heretofore, on the sixth day of August, 1888, the said defendant association made, executed, and delivered to plaintiff a certain written instrument, of which the following is a true copy, viz: —

"'Certificate No. 88.   Coupon No. 1.   $500.

"'SAN FRANCISCO, CAL., August 6, 1888.

"'Provided, Mr. Thomas C. Hogan shall be a member in good standing thereof on the thirteenth day of January, 1891, the Pacific Endowment League will pay to his order on that date the sum of five hundred dollars on presentation of this coupon to the secretary

[Signed]            "'J. G. SEVERANCE, President.

[Signed]            "'J. ALFRED LEUDERS, Secretary.'

"That plaintiff was a member of said defendant association in good standing on the thirteenth day of January, 1891, and on that date presented said coupon to the secretary of said association, the said J. Alfred Leuders, and demanded payment thereof, and said association then and there refused to make payment of said sum of $500 provided for in said coupon. That said demand was made by plaintiff on said thirteenth day of January, 1891, upon said defendant association, at said city an l county of San Francisco. That at the time of said presentation and of said demand, there were ample funds and money in said 'endowment fund' to fully pay said sum of $500 provided for in said coupon. That no part of said sum of $500 provided for in said coupon has been paid.

"Wherefore, plaintiff prays judgment against the said defendant association for the sum of $500, with interest and costs of suit, and that by said judgment the defendant association be directed to pay the same out of the said 'endowment fund'; and for such other, further, or different relief as may be just."

The only issues upon which any point is made on this appeal arise from a denial by defendant that the plaintiff was a member of the "Pacific Endowment League" in good standing on the thirteenth day of January, 1891, or at any time since; and the averment that he failed to pay eighteen assessments levied

by the league on January 2, 1891, and *ipso facto* forfeited and lost his right of membership in said league, and has ever since remained suspended.

The court found for the plaintiff upon all the issues of fact, and gave judgment accordingly.

The defendant appeals from the judgment and from an order denying its motion for a new trial.

The only point made by appellant is that the evidence does not justify the finding that the plaintiff was a member of the defendant association, and in good standing on January 13, 1891; and whether he was so or not depends solely upon the validity of the eighteen assessments which, it is admitted, the plaintiff refused to pay. If those assessments were valid, his refusal to pay them effected a suspension of his good standing as a member of the league; otherwise he was a member in good standing on January 13, 1891, and was then entitled to payment of the coupon set out in his complaint.

The defendant association or league was organized on March 8, 1888, and the plaintiff became a member thereof on March 9, 1888. On August 6, 1888, the defendant issued to plaintiff an "endowment certificate," by which it became obligated to pay to plaintiff $5,000 in ten equal coupon installments of $500 each, at the times and upon the condition expressed in the coupons. The first of said coupons matured January 13, 1891, and upon it this action was commenced January 29, 1891.

The by-laws of the league, as they were at the time plaintiff became a member, and remained until December 28, 1889, do not add to or change the condition expressed in the coupon, namely, that plaintiff "shall be a member in good standing on the thirteenth day of January, 1891"; but they provide that failure to pay quarterly dues and assessments "suspends a member without further action." The quarterly dues are $1.50 and the regular authorized assessments are levied monthly according to fixed rates, dependent upon the age of the member assessed (the plaintiff's rate being $3.50 per month). Besides this regular monthly assessment, section 3 of article IX. of the by-laws provides: "When the demands on the endowment fund require, the levy of additional assessments shall be made." Professing to act by authority of this section, the directors,

on January 1, 1891, thirteen days before the coupon in suit matured, levied eighteen special assessments of $3.50 each on plaintiff, all payable immediately, and addressed to plaintiff the following notice thereof: —

"SAN FRANCISCO, CAL., January 1, 1891.

"The board of directors, by resolution duly passed, has levied on the above date special assessment No. 3, which is now due and payable on all certificates registered up to and including December 31, 1889.

"Under our present laws no certificate is liable for a special assessment until after one year from the date of its registration, hence all certificates registered during the year 1890 are exempt from this special assessment No. 3.

"The special assessments are always of the same rate as the regular and delinquent on the last day of the month for which they are called.

"To protect the interests of the membership, eighteen extra assessments are hereby levied on all certificates of which the first coupon comes due within this month, payable besides special No. 3, before the warrant for the matured coupon can be drawn. They will, however, after the issuance of the warrant be credited on the second coupon as eighteen regular monthly assessments. This will be continued on maturing coupons from month to month until repealed.

"By order of the board of directors.

"J. ALFRED LUEDERS, Secretary

"Bring this card.

"THOMAS C. HOGAN, 146 Silver St., City."

Article I. of the by-laws provides: "There shall be a board of nine directors invested with full power and authority to enact laws for the government of the league."

Article IV. as it existed from the organization of the league until December 28, 1889, provided that "coupons shall be paid on the day they mature by warrant on the treasurer, . . . . upon surrender of the coupon." But this article was amended December 28, 1889, by adding thereto the following. "Provided the dues for the quarter, and the assessment or assessments levied *for the month in which the coupon is payable*, have been paid."

At the same time, December 28, 1889, a new article (numbered XXI.) was adopted as follows: "There shall be a reserve fund created by setting aside from the receipts in the endowment fund such portion as shall be deemed necessary by the board of directors for the protection of the members, and placed at interest."

Section 6 of article IX. provides: "The proceeds from assessments and any accumulation of interest derived from investment of assessment moneys constitute the endowment fund, from which all payments for maturing coupons are made, and the endowment fund shall not be used for any other purpose whatsoever."

Article XVIII. provides: "All moneys other than those mentioned in section 6 of article IX. go into the general fund, which shall be used to defray the expenses of the league"— this fund being composed of the initiation fees ($5 each), the quarterly dues of members ($1.50 each, or $6 a year), and certain fees and fines provided for.

The above amendment of article IV. and the adoption of article XXI. were evidently intended to authorize the creation of a reserve fund at the expense of the endowment fund, and thereby so reducing the latter as to justfy the levying of the eighteen, or any number of additional special assessments, at the discretion of the board, all payable within the month in which coupons are to mature, as a condition of the payment of such coupons. In this way it was proposed to make "the endowment fund *require* the levy of additional assessments," in the sense of section 3 of article IX. above set out. In no other way could the board have made the endowment fund "require the levy of additional assessments" to meet the demands upon it for the payment of coupons maturing in the month of January, 1891; since it appears, from an official report of the secretary, issued January 1, 1891, that the league then had in its treasury $83,034.80 properly and lawfully applicable to the payment of mature coupons, though the board had nominally divided it into three funds, as follows:—

"Reserve or guarantee fund.............................$58,522 65

Emergency fund........................................ 15,581 95

Endowment fund proper................................. 8,930 20

$83,034 80"

The same report of the secretary shows that $62,000 was disbursed from the endowment fund in payment of matured coupons during the year 1890, leaving the balance of $83,034.80; but it does not appear that any special assessment was levied upon the holders of the coupons paid during that year, the payment of which was enforced or required as a condition precedent to the payment of those coupons.

J. Alfred Lueders, who was the secretary of defendant from its organization until May, 1891, and since its president, testified in explanation of the eighteen special assessments, as follows:—

"The portion of the code of laws under which those eighteen assessments were levied, article IX., sections 3, 4, and 5, which gives the board of directors full power to levy them, section 3 being the main section.

"At the time this coupon became due, in January, 1891, the endowment fund was not insolvent, but there were so many demands that would have to come in a future time that we had to look for those demands. It was not only our ambition to pay these coupons that matured in January, 1891, but to pay all that were contracted before that time and will mature later on. A coupon is only payable on the date of maturity, and is not a demand until it matures. It is merely a prospective demand until then. When we levied these special assessments we had in view the other coupons that were to be paid, and we had to make provision in time to meet them when they would become due. As soon as these eighteen assessments were paid, we would have turned over to Mr. Hogan $500 for the coupon . . . . .

"We levied the eighteen assessments on the first coupon. After the first coupon has been collected by Mr. Hogan, he could have dropped the certificate. We levied them on the first coupon under our code of laws to make it legal. . . . . It was a protection to the members that we levied these eighteen assessments, in case Mr. Hogan would not continue his membership. Fifty-six dollars is all Mr. Hogan has paid in assessments, outside of the dues which are for expenses, towards the $500. It was to devise ways and means by which to protect the endowment fund as much as possible against such a thing, as a member may drop out the first month, and it was not

aimed at any particular member.  Mr. Hogan paid in so little it seemed only just to levy the eighteen assessments.

"The Court.  Why couldn't you have levied five hundred assessments?  If you could levy eighteen, why didn't you levy more?  A. That would be highway robbery.  Eighteen assessments levied on a certificate which has only paid $56 is very just, and only justice to the other members.

"We had about $83,000 in bank to the credit of the endowment fund when the coupon matured on the 1st of January, 1891, and the amount due for coupons maturing in that month was between $15,000 and $20,000.  To speak more exactly, $23,500.  The coupons to fall due in the following month, and those to mature, required a sum largely in excess of $83,000 to pay such coupons, and therefore it was a necessity to levy eighteen assessments in January, 1891, to protect the payment of coupons immediately following."

In his said report of January, 1891, the secretary further says: "This is a measure adopted for the equalization of payments, and for the protection of those members whose first coupon falls due at the later date, and as the application for membership was made by every member for a certificate of $5,000, of which a coupon is only a part, this action is amply justified, and meets with the cordial approval of every well-meaning member."

It is obvious that the defendant association was brought into existence for the sole benefit of its promoters and officers, who were to feed upon the so-called general fund which was sacredly dedicated to them; and quite as obvious that it was constitutionally doomed to a short life; hence, the doctoring to prolong the agony of its sickly existence.  It is, however, the creature of contract, and must be governed by the law of contracts. Not being incorporated its written articles of association constitute a contract by which the duties of its officers, the duties and obligations of its members among themselves, and the scope of its business are to be defined and regulated.  Its articles of association bear to it the same relation that a charter bears to an incorporated society, and constitute its fundamental law, in accordance with which all subsequent by-laws, regulations and amendments must be made.  (Niblack on Mutual Benefit Societies, sec. 1; Bacon's Benefit Societies, secs. 37, 62· notes

to *Austin* v. *Searing*, 69 Am. Dec. 670; *Otto* v. *Journeymen Tailors' Union*, 75 Cal. 309; 7 Am. St. Rep. 156.)   The obligation of this class of contracts for the payment of money, or for the security of any other right of property, are as sacred as those of any other contract, and a breach thereof will be remedied by the courts.   (Bacon's Benefit Societies, secs. 61 *a*, 105, 106, 107, and cases cited.)   The mere fact (conceding it to be such) that the articles of association constituting the contract do not operate equally upon the individual members, confers no authority upon the directors to change or amend such articles for the purpose of "equalization of payments" or other burdens imposed by the original compact otherwise than authorized by the original articles.   As such change or amendment would impair the obligation of the original contract, it could have been made only by consent of all members to be affected thereby; and such consent is not implied in article I., which confers upon the board of directors power "to enact laws for the government of the league"; because it must have been understood that this power was limited by the laws of the land with reference to which the article conferring it must be construed. (Niblack on Mutual Benefit Societies, secs. 20, 24; Bacon's Benefit Societies, sec. 84.)

Besides, "the equalization of payments" sought to be effected by the eighteen assessments, according to the testimony of the president, could have been accomplished only by compelling each member to pay his own coupons as they matured, in addition to his quarterly dues, initiation fees, fines, etc., for the support of officers.   This, though not *highway* robbery, would have killed the institution immediately.

It is claimed that the levying of the eighteen assessments was authorized by the original section 3 of article IX., because, it is said: "The demands on the endowment fund required" such additional assessments; yet it appears that the amount of the coupons falling due in January, 1891, was only $23,500, and that there was then in the endowment fund $83,000; for there was no provision in the original articles for creating a reserve fund from the receipts of the endowment fund, nor for transferring any part of the endowment fund to any other fund; nor any provision in either the original or amended articles for an

"emergency fund"; and, therefore, the alleged transfer of $74,104 from the endowment fund to the supposed reserve and emergency funds had no actual existence. Indeed, there is no evidence of any resolution of the board to that effect. Besides, section 6 of article IX. provides that the endowment fund shall not be used for any other purpose than the payment of matured coupons. For what purpose could any part of the endowment fund have been reserved? The placing of such portion of it as was not immediately needed at interest was no reservation of it from the purpose to which it was exclusively dedicated; nor is it easy to conceive of any purpose or occasion for any "emergency fund." All possible demands upon the endowment fund were payable in definite sums at fixed times. There was no chance for any unexpected valid demand upon that fund.

It follows that there was no legal necessity for levying the eighteen special assessments on January 1, 1891, and, therefore, they were invalid. (*Thomas* v. *Whallon*, 31 Barb. 178; *Pacific Mut. Ins. Co.* v. *Guse*, 49 Mo. 332; 8 Am. Rep. 132; Niblack on Mutual Benefit Societies, sec. 277.) In levying assessments the directors act ministerially and not judicially, and, therefore, no presumption arises in favor of their legality or regularity (Niblack on Mutual Benefit Societies, sec. 280; Bacon's Benefit Societies, sec. 377); nor can assessments be made for anticipated losses unless provision therefor is made in the articles of association. (*Rosenberger* v. *Washington Mut. F. Ins. Co.*, 87 Pa. St. 207; *Crossman* v. *Massachusetts Ben. Ass'n*, 143 Mass. 435.)

There are other probably valid objections to the eighteen special assessments, but the foregoing are sufficient to show them to have been invalid. Being invalid, the refusal of the plaintiff to pay them did not have the alleged effect of suspending him from good standing as a member of the league.

I think the judgment and order should be affirmed.

TEMPLE, C., and BELCHER, C., concurred.

For the reasons given in the foregoing opinion, the judgment and order appealed from are affirmed.

FITZGERALD, J., McFARLAND, J.

DE HAVEN, J., concurring.—I concur in the judgment.