[Civ. No. 7540. First Appellate District, Division One.—September 2, 1931.]

MILTON G. COOPER & SON, INC., Respondent, v. WILLIAM R. DAVIS AND BROTHER, INC. (a Corporation), Defendant; J. H. NEWBAUER, etc., et al., Interveners and Appellants.

Francis J. Heney, William J. Hayes, Grant H. Wren and Charles H. Patterson for Appellants.

Dunne, Dunne & Cook, Barker, Smiley & Keithly, and Morrison, Hohfeld, Foerster, Shuman & Clark for Respondent.

THE COURT.—Plaintiff corporation, which has its principal place of business in Los Angeles, was at all times material to this case and until about January 25, 1926, a member of an unincorporated association of merchants known as the San Francisco Board of Trade (which will be hereinafter referred to as the board). For some time prior to the month of August, 1925, William R. Davis and Brother, Inc., a corporation (hereinafter called the defendant), had been engaged in the conduct of a department store on Mission Street in San Francisco. On August 5, 1925, a meeting of the creditors of the defendant was held at the office of the board at San Francisco for the purpose of considering defendant's affairs. The creditors represented at the meeting consisted of both members and nonmembers of the board, and their claims comprised approximately eighty per cent of defendant's indebtedness. At this meeting a committee, consisting of the representatives of both the members and nonmembers was appointed. The committee proceeded to take an inventory of defendant's property, and negotiations commenced which resulted in an offer of settlement being made to the committee by the defendant of a sum sufficient to pay forty per cent of the claims of all its creditors. A majority of the committee recommended that the offer be accepted; and following meetings of the creditors held on various dates between November 10, 1925, and January 14, 1926, inclusive, but at which plaintiff was not represented, it was resolved to accept the offer. These amounts were in January, 1926, paid to each of the creditors except the plaintiff, and a sum equal to forty per cent of the latter's claim was deposited with the board. The plaintiff, whose claim amounted to $6,643.57, had on September 25, 1925, brought suit against defendant and attached. The attachment was later released upon security being given. On January 15, 1926, defendant answered plaintiff's complaint, alleging payment, the facts constituting this defense being that the committee had full power to bind the creditors and to enter into an agreement for a

composition; that defendant offered to pay to the committee forty per cent of its entire indebtedness in cash, this being in full payment of its entire indebtedness and in full satisfaction of any and all liability of any stockholder, officer or director of defendant; that the committee accepted the offer in full payment of all claims, including that of the plaintiff, and that the agreed sums were paid to and accepted by the plaintiff and the other creditors in full satisfaction of their claims.

On February 19, 1926, a complaint in intervention was filed by J. H. Newbauer & Co., for whom J. H. Newbauer was afterwards substituted, and Levi Strauss & Co. This complaint was on behalf of other members of the board who were creditors of the defendant. It alleged that by the attachment suit plaintiff sought to obtain a preference over other members of the board, and that under the board's constitution and by-laws members who were creditors were entitled to share ratably with plaintiff in any recovery effected in its action. Plaintiff's answer to the intervener's complaint denied the construction placed upon the constitution and by-laws of the board, or that plaintiff sought to obtain a preference. As a special defense thereto plaintiff alleged in substance the facts of the transaction above set forth, and that before the present action was brought plaintiff caused an investigation to be made, and found that defendant's assets would yield a higher return to the creditors than the amount offered; that the committee was proceeding without proper investigation; that the proposed settlement was inequitable and fraudulent within the meaning of the constitution of the board and permitted a portion of defendant's assets to be reserved for distribution to its stockholders; that plaintiff conveyed this information to the board and protested the proposed settlement, but the latter and the creditors' committee notwithstanding consummated the settlement; that the administration of the matter by the board was inefficient and uneconomical and was concluded without the fullest or proper investigation.

The cause was first tried on the issues between the plaintiff and the defendant by a jury, and resulted in a judgment for the plaintiff. The action between plaintiff and the interveners was then tried by the court without a jury, and

was submitted and decided upon all the evidence adduced at the first trial with certain additional evidence. Thereafter the court, pursuant to its findings, rendered a judgment that interveners take nothing. No appeal was taken by the defendant, but the interveners have appealed from the judgment entered against them.

The court found in accordance with the allegations of plaintiff's answer to the complaint in intervention, and also against interveners' allegations that plaintiff sought to obtain a preference or advantage in the collection of its claim over other creditor members of the board, or that under the constitution or by-laws of the board the creditor members were entitled to share with plaintiff any sums recovered by it; also that assets of the defendant of the value of $112,000 were not applied on its indebtedness, but were distributed to its stockholders.

As grounds for the appeal it is contended that the trial court's construction of the constitution and by-laws was erroneous, and that the findings are unsupported by the evidence.

The facts disclosed by the evidence are as follows: The defendant commenced business in 1924; 300,000 shares of its preferred and 350,000 shares of its common stock were issued, and all the common stock except the qualifying shares was held by William R. and Harry C. Davis. The company fell into financial difficulties in May, 1925, when it called upon the Mercantile Trust Company for assistance, and this concern ultimately became a creditor to the extent of over $100,000. During May, 1925, a representative of the trust company became a member of defendant's board of directors and its treasurer, and continued his connection with defendant until July, 1925, when its affairs became so involved that he advised an application to the board for assistance. Certain of defendant's creditors were members of the board, and as above stated the first meeting of creditors was held on August 5, 1925. Creditors holding about eighty per cent of the claims against defendant were represented at the meeting, and it was then resolved that representatives of a committee consisting of certain creditors be sent to defendant's store ''for the purpose of taking an inventory'', and a letter from the board to the creditors on August 8, 1925, after reciting the appointment of the committee,

stated that "representatives of this committee are taking inventory and preparing an accurate statement of the assets and liabilities"; also that "pending completion of this work and a definite arrangement with the creditors the net cash receipts are being impounded. This report when completed will be submitted to you together with its recommendations."

According to plaintiff's representative he was offered a position on the committee, and accepted, and was told that he would be notified of any further meetings of the committee. He was not made a member, and it was testified that with the exception of the above letter plaintiff received no notification from the board of any action by the committee until September 23, 1925. In the meantime, however, plaintiff, under date of September 10, 1925, had written the board requesting advice with regard to the condition of defendant's affairs, but received no reply.

The inventory was completed on August 31, 1925, the value placed upon defendant's assets, including cash on hand in the sum of $53,326, being a total of $327,326. The committee estimated the "realizable value" of the assets to be the sum of $210,000, stating in their report that "the estimated realizable values are arbitrary figures, and are made for the purpose of arriving at an approximation of the maximum recovery which may be expected". Defendant's liabilities, according to the minutes of a meeting of the committee held on September 1, 1925, at which time the report of the appraisers was considered, were estimated to be $366,000; and at this meeting it was stated by the chairman that after exact figuring the value of the merchandise had been placed at $177,000. At meetings of the committee held on September 14 and 16, 1925, various offers of settlement were considered, and finally the offer of forty per cent was made by defendant. This offer all the representatives of the members of the committee except the representative of the Mercantile Trust Company expressed themselves satisfied to accept, and on September 19, 1925, one Albert Baer deposited with the committee the sum of $10,000 with his accepted order for $92,548.65, the minutes of the committee reciting that these sums, with $57,750 or thereabouts then on hand, would be approximately the amount necessary to pay the forty per cent offered. It appears that the sum mentioned as being on hand was

money collected on sales since the appointment of the creditors' committee, and was the "cash on hand" shown in the inventory.

No action in connection with the offer appears to have been taken by the board or the creditors until November, 1925; and in the meantime the defendant caused to be filed a notice which led to the commencement of the present suit. On September 23, 1925, there appeared in the "McCord Daily Notification Sheet", a trade publication, the fact that defendant had filed a notice of its intention to sell to Albert Baer on September 25, 1925, its stock in trade in bulk, with its fixtures, furnishings, equipment and outstanding accounts receivable. Plaintiff learned of this on the same day; and telegraphed the board asking information as to the proposed sale, and whether all claims would be paid in full, to which no reply was made. Plaintiff then communicated with a mercantile concern in San Francisco, which procured from the board a summary of the report made by the committee showing defendant's assets and liabilities, and the information that defendant proposed a forty per cent settlement with its creditors without assignment. On September 24, 1925, plaintiff's representative, accompanied by one Sugarman, who was engaged in the business of purchasing bankrupts' stocks, arrived in San Francisco from Los Angeles. They visited the office of the board, where Sugarman offered $177,000 for defendant's stock in trade, not including the cash on hand or accounts receivable. The evidence supports the conclusion that Sugarman was ready, willing and able to purchase and pay the amount offered. Moreover, it shows that before bringing suit plaintiff protested to the attorney for the board that the proposed settlement was not for the best interests of the creditors, but was told that should any action be brought to prevent consummation of the transfer to Baer "the case would be immediately thrown into bankruptcy and the forty per cent settlement forced through regardless", it being further stated by the board's representative that there had been no assignment by defendant to the board and that the latter had nothing to sell.

Sugarman's offer having been refused, and the plaintiff being dissatisfied with the amount of the offer of settlement,

in order to protect itself against the proposed sale to Baer, brought suit on its claim and attached.

During the negotiations for a settlement defendant's officers had been endeavoring to find a purchaser for the store. Several concerns were approached, including the firm of Whitthorne & Swan, who ultimately became the buyers. On September 18, 1925, said William R. Davis and Harry C. Davis entered into a contract with Baer, which recited that defendant had authorized the sale of its merchandise, outstanding accounts receivable, furniture, fixtures and equipment to Baer for the sum of $108,000, and had directed a notice of sale thereof as required by section 3440 of the Civil Code; and had further directed that such part of the above sum as might be necessary for a settlement with all its creditors at forty per cent net cash, with expenses in the sum of $5,000, be paid to the Board of Trade. These amounts Baer agreed to pay, it being further provided that Baer should go into possession of the store and conduct a sale of the merchandise, he agreeing to resell the stock, etc., to the Davises or anyone designated by them on or before January 15, 1926, for $15,000, plus the sum of $108,000, with interest at six per cent. It was also agreed that Baer should be reimbursed for all expenses in conducting the sale and replenishing the stock, and credit upon the repurchase price all receipts from sales, and that should the sums agreed to be paid to him be realized from the sales before December 1, 1925, the sum of $5,000 should be deducted from the repurchase price.

Pursuant to his contract Baer took possession on September 25, 1925, and continued in possession until about November 12, 1925, when a sale of the stock, fixtures, outstanding accounts and goodwill was made to a representative of Whitthorne & Swan for $185,097.13. The notice of sale given under section 3440 of the Civil Code was dated November 4, 1925, and signed by defendant by William R. and Harry C. Davis and Albert Baer. At this time there was unpaid to Baer under his contract with the Davises the sum of $72,624.15, and this amount he received by check from Whitthorne & Swan, the balance of $112,472.98 being paid to defendant corporation, which in turn distributed to its preferred stockholders the sum of $77,211.36, and the balance of $35,261.62 to William R. and Harry C. Davis,

the owners of its common stock. In addition it appears that accounts receivable amounting to over $17,000 were retained by defendant, the buyers being of the opinion that they were not collectible. The estimated value of these, however, according to an application made to the corporation commissioner by defendant's officers in January, 1926, was about $9,000.

The evidence shows sufficiently that the Baer transaction was merely an advancement for the purpose of settlement with defendant's creditors, secured by a transfer of a part of its assets As stated, no further meetings of the creditors or their committee appear to have been held until November 9, 1925, on which date there was a creditors' meeting, at which plaintiff was not represented. The attorney for the board called attention to the filing of the notice of intention to sell to Whitthorne & Swan, and also to the fact that the Mercantile Trust Company had levied an attachment on the store for $120,000. After considerable discussion with defendant's attorney regarding the terms and effect of the proposed sale it was resolved not to interfere therewith and that the settlement offered by defendant be approved. The matter was further discussed on November 11, 1925, when it appeared that a payment had been made by defendant or the Davises to the Mercantile Trust Company and its attachment released, and on January 14, 1926, when the creditors again resolved to accept defendant's offer. Following this meeting distribution to the creditors filing releases was made by the board.

As shown, the board received from sales of defendant's stock in trade up to the time Baer took possession about $57,750, which was applied as part of the amount to be paid in settlement of the claims. The exact amount of the stock sold by Baer while in possession does not appear, as neither he nor the defendant was able to produce the accounts covering this period. It is a fair conclusion, however, from the fact that Baer under his contract was to be paid $108,000 with interest at six per cent and the further sum of $10,000 in case of a repurchase before December 1, 1925, and that he was paid by Whitthorne & Swan the sum of $72,624.15 for his interest—the difference, as he testified, having been received from the sales—that the amount of stock sold by him amounted to nearly $50,000. After these

amounts had been sold Whitthorne & Swan paid for the balance of the stock with the accounts receivable, furniture and fixtures and goodwill, the sum of $185,097.13. This evidence tends to support the court's conclusion that an efficient and economical administration of defendant's estate would have resulted in the payment to the creditors of an amount greatly in excess of the sums received by them, and that defendant was permitted to dispose of its assets and effect a settlement without the fullest investigation as provided by the constitution of the board.

Article II of its constitution provided that "its objects shall be to consider all subjects pertaining to the interests of the wholesale merchants; to prevent settlement by insolvent debtors without the fullest investigation; to resist all inequitable and fraudulent settlements; . . . to bring about joint action in dealing with embarrassed or insolvent debtors and in the collection of debts other than in the usual course of business, and to secure efficient, economical and expeditious administrations of insolvent estates". The by-laws provided that members should be obligated among other things to commence suits against common debtors through the attorney of the association or his correspondents, and not to resort to any act, device, secret understanding, connivance or collusion whereby they might obtain, claim or seek to obtain any preference or advantage over each other in the collection or settlement of any claims or demands against common debtors. Further, that all payments received or recoveries effected in violation of these provisions should be for the ratable benefit of other creditor members; also that any member might procure the calling of meetings of member creditors of common debtors, at which a committee should be chosen to direct and control whatever action the creditors might agree upon; or, where the creditors referred the case to the committee, to take such action as might seem advisable. Another section provided that "in the administration of cases all questions respecting the action to be taken shall be determined by a majority of the committee, or, if the matter is before the creditors for decision, by members representing a majority in amount of the claims". As to compromises with common debtors, however, section 2 of the by-laws provided as follows: "The unanimous consent to compromises with common debtors shall be necessary, pro-

vided, however, that when a composition instrument or release in consideration of a transfer of assets shall have been signed by members representing ninety per cent of the indebtedness owing to members, or shall have been signed by creditors representing ninety per cent of the total indebtedness owing to members and nonmembers, the secretary shall sign the instrument or release for and on behalf of members whose claims singly and not collectively are less than $250.00, and such members shall be bound thereby.''

Appellants concede that by the last section of the by-laws plaintiff could not be compelled to consent to a compromise of its claim by reason of the acceptance by the other members of defendant's offer; also that while plaintiff might after the committee ceased to act in the matter maintain an action for the enforcement of its claim, it was its duty in the meantime to act jointly with the other creditors or not at all; and this notwithstanding a transfer of defendant's assets might render valueless a subsequent judgment.

As urged by appellants, the constitution and by-laws of the board constituted a contract between its members and in their relation to the association. (*Hogan* v. *Pacific Endowment League,* 99 Cal. 248 [33 Pac. 924]; *Dingwall* v. *Amalgamated Assn., etc.,* 4 Cal. App. 565 [88 Pac. 597].) The by-laws, however, contain no specific requirement that a creditor member who is not bound to compromise with a debtor shall refrain from action pending the satisfaction of the claims of his fellow members who enter into such an arrangement. And whatever the obligation of a member who joined with others in actions against common debtors, or to abide by the decision of other creditor members or their committee in ordinary cases, where, as here, the other members do not wish to sue, and resolve upon a course which admittedly the plaintiff was not bound to follow, no reasonable construction of the by-laws supports the conclusion that his right of action was suspended pending payment of the claims of the other creditors. The by-laws should be given a reasonable construction (14 Cor. Jur., Corporations, sec. 439, p. 350) ; and to give them the effect contended for by appellants where it is clear that the other creditors were not prejudiced by plaintiff's action, or where the debtor would thus be permitted to make away with assets largely in excess of the amount necessary to meet appellants' claims, and as a

478

reasonable probability render fruitless any judgment recovered by plaintiff after the payment of these claims, would work a manifest injustice, a result which the language of the by-laws does not require.

· We are satisfied that the trial court correctly construed the constitution and by-laws of the board; that its conclusions that the plaintiff did not resort to any act whereby it obtained or sought to obtain any preference or advantage over its fellow members within the meaning of the by-laws, and that the committee proceeded without the full investigation of the condition of defendant's affairs contemplated by the constitution, were fully sustained; and that plaintiff under all the circumstances shown was justified in bringing and maintaining its action. The judgment appealed from is affirmed.

· A petition for a rehearing of this cause was denied by the District Court of Appeal on October 2, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 29, 1931.