[Civ. No. 4828. Third Appellate District.—August 14, 1933.]

MAE G. WALTER et al., Respondents, v. A. F. ENGLAND, Appellant.

678

Conley, Conley & Conley for Appellant.

F. M. Ostrander, C. Ray Robinson and James D. Garibaldi for Respondents.

Gerald M. Desmond, Hartley F. Peart, Hadsell, Sweet, Ingalls & Lamb, Sutherland, Dearing & Gertberg, Redman, Alexander & Bacon, Frank V. Campbell and L. H. Schellback, as *Amici Curiae* on Behalf of Appellant.

BURROUGHS, J., *pro tem.*—This is an action for damages for malpractice. The defendant is a dentist. A jury awarded the plaintiffs the sum of $12,000. On motion for a new trial the court made its order that said motion would be denied on condition that the plaintiffs remit $4,500 of the judgment. The plaintiffs conformed to the condition and the motion was thereupon denied.

This is an appeal by the defendant from the judgment, and also from an order of the court denying his motion for a judgment in his favor, notwithstanding the verdict.

The first assignment of error is that the verdict is not supported by the evidence. Before examining the evidence it is well to state a few of the settled principles of law, relative to this class of actions, which, in our opinion, control the question of the sufficiency of the evidence adduced on the trial to sustain the verdict and the judgment.

█ *Barham* v. *Widing,* 210 Cal. 206–213 [291 Pac. 173, 176], is authority for the rule "that a dentist, like a physician, is required to have and use only the degree of learning and skill which is ordinarily possessed by dentists of good professional reputation in that locality. This is the rule with respect to physicians. (*Hesler* v. *California Hospital Co.,* 178 Cal. 764 [174 Pac. 654].) Undoubtedly, the same rule applies to dentists."

█ In *Roberts* v. *Parker,* 121 Cal. App. 264–267 [8 Pac. (2d) 908, 909], after citing with approval the above rule, it is held that it is also well settled that neither physician nor dentist can be held to guarantee the results of his professional services. "However, it is equally well settled that in undertaking the treatment of a patient the practitioner impliedly contracts and represents not only that he possesses the reasonable degree of skill and learning possessed by others in his profession in the locality, but that he will use reasonable and ordinary care and skill in the application of such knowledge to accomplish the purpose for which he is employed; and that if injury is caused by a want of such skill or care on his part, he is liable for the consequences which follow. (*Houghton* v. *Dickson,* 29 Cal. App. 321 [155 Pac. 128]; *Nelson* v. *Painless Parker,* 104 Cal. App. 770 [286 Pac. 1078]; *Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642]; *Hesler* v. *California Hospital Co.,* 178 Cal.

764 [174 Pac. 654]; *Loy* v. *Bishopp,* 88 Cal. App. 313 [263 Pac. 369]; *Patterson* v. *Marcus,* 203 Cal. 550 [265 Pac. 222].)''

A settled principle of law is stated in *Barham* v. *Widing, supra,* page 214, as follows: ''It is equally true that cases which depend upon knowledge of the scientific effects of medicine, or the result of surgery, must ordinarily be established by expert testimony of physicians and surgeons. (*Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642].) This rule, however, applied only to such facts as are peculiarly within the knowledge of such professional experts, and not to facts which may be ascertained by the ordinary use of the senses of a nonexpert.'' The foregoing doctrine is also sustained in *Roberts* v. *Parker, supra; Patterson* v. *Marcus, supra; Nelson* v. *Painless Parker, supra.*

We must also keep in mind the well-settled rule of law that the appellate court cannot disturb a finding of the trial court or the verdict of a jury, for lack of evidentiary support, unless such finding or verdict is without substantial support in the evidence. (10 Cal. Jur. 1165, sec. 378; *Jacobsen* v. *Northwestern P. R. R. Co.,* 175 Cal. 468 [166 Pac. 3]; *Perera* v. *Panama-Pacific Int. Exp. Co.,* 179 Cal. 63 [175 Pac. 454].)

In the light of these recognized principles of law, we will examine the evidence for the purpose of ascertaining whether the verdict is sustained by any substantial evidence.

On the morning of March 5, 1929, the appellant, Dr. A. F. England, who was a duly licensed dentist, practicing his profession in the city of Merced, was performing certain dental work for the plaintiff, Mrs. Mae G. Walter. (The latter's husband is joined herein as plaintiff because of the marital relation.) Preliminary to the extraction of two of Mrs. Walter's teeth, Dr. England selected a hypodermic needle and syringe for the purpose of giving a local anesthetic of novocaine, and inserted the needle in the fibrous tissue of the gum on the right side of the lower jaw. The needle thus inserted broke, and about one inch of it remained in the internal pterygoid muscle of the patient's jaw. Although there have been operations to remove the needle, they have been unsuccessful, and according to Mrs. Walter, the embedded needle causes her to suffer severe pain, headaches and nervousness.

E. L. Walter accompanied his wife to the office of Dr. England, and was present when the needle was broken. He testified in substance that upon entering the office he said, "Good morning, Doctor; how are you feeling? Something to that effect"; to which the doctor said he felt like hell. "Well, he said he had been up to Stockton the night before at a dental meeting; that he felt terrible; that he had a very severe attack of hay fever; that particular morning it had been bothering him." The witness stated further that during the time the doctor was operating upon his wife, he, the witness, was "standing right along . . . right beside the chair . . . He worked on the tooth that he was going to extract. He took this needle or bone, or whatever they call it, and he injected it into her right jaw and when he did he let out an oath and said we were in an awful mess . . . He said, 'Jesus Christ, we are in for a hell of a mess.' I said, 'What is the matter, doctor; what did you do?' 'Well,' he said, 'this needle is broke off; we've got to get it out in a hurry.'" In answer to a question as to the time that it took after he started to inject the needle, and such time as he made the statement, the witness said, "Well, I would say it was momentarily . . . well, he turned, he got this injection, this needle, and naturally opened her mouth, and I saw him making the injection, and he turned and made that remark. . . . Q. How much time elapsed from the time that you saw him make the injection until he turned and made the remark, if you know? A. Oh, I don't imagine it was more than a second or two. Q. Now, then, after he made this remark and stated that he had to get the needle out right away, then what did he do, if anything? A. Why, he put the . . . he brought the end of the thing down that he had in his hand, and proceeded to lance the gum; went in to try and get the needle out. Q. And during the time of that operation, did he say anything to you or show you anything in regard to the needle? A. Well, when he lanced it, he worked quite a little while probing, and so forth, and when he lanced clear in, I don't know what you would call it, but nevertheless, it was way in the back of the jaw. I was standing right there and he showed me; I would say there was a hole in the gum in the back where the two jaws come together; it appeared to be probably half an inch in diameter, or something of that sort, and I observed a—I

called it a strap hinge, it was a little piece, it looked to me like a little pink strip of cartilage, and he took his probe and he said, 'Well, here's where the thing went in,' and he said, 'I made the mistake of not putting it on either side,'; he said, 'I shoved it right through the center of it, and that is the cartilage and gristly and very tough,' and he says, 'that is what caused it to break'. Inasmuch as it is broken and closed over the needle, he couldn't cut that or she would lose the use of her jaw, so he stopped cutting at that time; didn't try to lance any further. . . . Q. And when he showed you that point, and stated that he made a mistake, that he ought to go on either side, did he say anything in regard to what caused the needle to break? A. Yes, that shoving through that cartilage, that tough part. Q. Did he say anything else in reference to that, other than what you have related as to where the needle should have been placed? A. On either side of it."

The witness further testified that at another time he called at Dr. England's office and asked him if, when the doctor went to San Francisco, he would not call on his insurance company and tell them that he had made a mistake on a friend and reimburse him for the expense. At which request the doctor broke down and cried and said: " 'I will. It is very decent of you to come in here and take the attitude that you have taken,' and he said, 'I'll go down to my insurance company when I am in San Francisco and will tell them that I have made a mistake, and I'll be back either tomorrow or the next day and will come in and let you know what the results have been.' " He further stated that the doctor did not come in to see him on his return from San Francisco, and he had not spoken to him since.

Plaintiff Mae E. Walter testified that she and her husband and Dr. and Mrs. England had been on terms of social intimacy and friendship over a long period of time; that on the morning of March 5, 1927, she and her husband visited Dr. England by appointment to have some dental work done for her. She said, "Hello, Doc, how are you?" and he said he felt like hell. She asked him the trouble and he said he was out till the wee hours of the morning, and had a terrible case of hay fever. She got into the dentist's chair and he looked over her teeth and did some cleaning and put some iodine in her mouth. He looked at the tooth

that had been aching and said it had to come out, and also a wisdom tooth needed to be extracted. Then he started to inject the hypodermic needle. In answer to a question she said, "Well, it seemed to me that it went in all at one time —just went right straight in; it went in just very quickly. . . . Q. Then, did Dr. England say anything to you in regard to the needle? A. Yes, he uttered an oath; said we were in for an awful mess."

The witness further testified in response to a question, that from the time he first injected the needle, that is, from the time she first felt the point of it in contact with her gum, until he said they were in an awful mess, the time that elapsed was—"A. Well, just as quick as that, I don't know; a few seconds." (Mr. Ostrander: For the record, indicating by a snap of his fingers.) "Q. Then, after the needle broke off, what did he do? A. Well, he showed Mr. Walter where it went in; he first began to carve and try and get the needle, because he could see, he said, where it was, and carved for quite some time before he took an X-ray; then he lost it and could not see it; he took X-rays. Q. And, do you remember what he said to Mr. Walter? A. Yes, he said that 'I have made a mistake—this is where I made my mistake,' he said, 'I should have—I put it through the cartilage and it should have been put on the side.' "

On January 3, 1930, the witness again visited Dr. England's office in company with a Mrs. Wayne, and the doctor took X-rays, and the witness testified she asked him if the needle had moved and he said, "Yes, possibly a quarter of an inch."

Mrs. L. A. Wayne, called as a witness, testified that she was present with Mrs. Walter in the office of Dr. England when an X-ray picture was taken and after the doctor had examined the pictures, heard him say the needle had moved a little.

Anne Johnson, who was the nurse in the office of Dr. England, and who was present at the time of the accident, testified that the length of time that elapsed from the time that Dr. England began the operation until the needle broke was from thirty to forty-five seconds.

Dr. England testified that he intended to pull the six year old molar and the wisdom tooth on the lower right jaw of the patient; that he was using a Cook's carpule syringe of

the cartridge type; that the anesthesia to be given was a block anesthesia with novocaine, which, in the language of the witness, "It means that we inject back into the mandible, the ramus of the mandible, blocking the inferior dental nerve which supplies all the teeth of the lower jaw on that side." He further testified that the time that elapsed from the time he first inserted the needle of the tissue until it broke was fifteen, thirty or forty-five seconds. He did not time himself in the injection. Dr. England further testified as to the entire course pursued by him in the treatment of the patient, which included calling in another dentist, consulting an oral surgeon living in Oakland, and various other steps, including the taking of X-ray pictures. Dr. England denied the statements which were attributed to him by the plaintiffs. After the testimony of defendant had been given, his counsel propounded to experts a hypothetical question based upon the testimony of the doctor, and in answering the question, the experts stated that in their opinion the procedure followed by Dr. England, using the language of one of them, "would do justice to any community in the United States". Included in the question last adverted to was the following: "That the doctor placed the syringe in the right hand, resting his thumb on the plunger, and that prior to the injection, or the commencing of the injection of the anaesthetic, the doctor determined the internal oblique line by palpation with the left index finger, along the lower right jaw, and determined the point for the injection as approximately one centimeter above the occlusal surface of the plane of the lower molar teeth, the distance being measured with the eye; assuming that there was no inflammation visible about the area in which the injection was to be made, and that the doctor began the insertion of the needle at the point of selection, using the center of his left index fingernail as a guide, and gradually inserted the needle, commencing to inject the solution immediately after the entrance of the needle and continuing as the needle moved farther into the tissue; that the doctor did not change the angle of the needle after making the puncture of the tissue and felt no obstacle or resistance other than the normal resistance of the tissue; that the needle broke suddenly and without warning near the hub of the syringe, but the hub of the syringe did not touch the gum, it being about an

eighth of an inch from the gum at the time the needle broke; that the broken end of the needle completely disappeared in the tissue . . . and that the needle broke about thirty or forty-five seconds after the commencement of the injection of the novocaine.''

The foregoing portion of the hypothetical question is consistent with the testimony of Dr. England, but it is inconsistent with the testimony of Mr. and Mrs. Walter, wherein the latter witnesses testified that the length of time that elapsed from the time of the first insertion of the needle to the time it broke was not more than a second or two, and that when he injected the needle into her jaw he let out an oath and said, ''We are in for a hell of a mess.'' It is inconsistent with the statements of Dr. England, made to Walter at the time, that he had made a mistake; that he shoved the needle right through the cartilage which is gristly and very tough; that he should have put it on either side, and that is what caused it to break. This, coupled with his further statement to Mr. Walter, that he would tell the insurance company he had made a mistake, merely raised a conflict in the evidence. It is true that all of these statements were denied by the doctor, but in spite of the fact that questions of method and procedure in cases of this kind can be passed upon only by experts, still the matters testified to by the plaintiffs are not technical matters, but purely questions which may be evidenced by nonexpert witnesses. It is said in *Barham* v. *Widing, supra,* in speaking of the necessity of expert testimony to establish the result of surgery: ''This rule, however, applies only to such facts as are peculiarly within the knowledge of such professional experts and not to facts which may be ascertained by the ordinary use of the senses of a nonexpert.''

In *Nelson* v. *Painless Parker, supra,* it is said: ''Appellant's next contention is that in an action of this kind expert evidence is necessary to establish the negligence, and that there being none, the judgment should be reversed. We will agree with the first part of this proposition partially only, for reasons which will later be more particularly referred to. But as has been said heretofore, there was some testimony of experts relative to what should have been done by the operating dentist, and it was for the jury to determine the facts. They saw and heard the witnesses and saw the gestures which

illustrated the proper thing to be done, and were in a better position to resolve the conflict than is an appellate court. It is true that the evidence of negligence in the instant case was slight, and its probative value may not be great, but we may not interfere with the finding of the jury, and if the judgment based thereon may be sustained on any reasonable theory, it will not be disturbed by the appellate court.'' (*Rocha* v. *Garcia,* 203 Cal. 167 [263 Pac. 230–240].)

Under these authorities we have in the record the evidence of Dr. England as to his procedure in the case at bar. We have the evidence of other experts that such procedure was proper, but, we also have the evidence of the plaintiffs on the lay-matters that he did not follow such procedure. As an example, instead of taking thirty to forty-five seconds to insert the needle and inject the novocaine, he did so in one or two seconds. Dr. England is certainly an expert, and according to the testimony of the plaintiffs, he admitted that he shoved the needle into the cartilage, which was very tough, and which he said was the cause of the needle breaking, and he said that he should have injected it on either side. This evidence, if the jury believed it, was sufficient to sustain the verdict. As said in *Roberts* v. *Parker,* 121 Cal. App. 264–270 [8 Pac. (2d) 908, 910]: ''In other words, after the verdict of the jury has been fairly rendered, all of the circumstances of the case, together with any reasonable inference which may be drawn therefrom, will be marshaled in support of the judgment. (*Barham* v. *Widing, supra.*) Measured by the foregoing rules, the circumstances of the present case are legally sufficient to sustain the jury's verdict. (*Dimock* v. *Miller,* 202 Cal. 668 [262 Pac. 311, 312] ; *Loy* v. *Bishopp, supra.*)''

In *Dimock* v. *Miller, supra,* in speaking of the weight to be given to evidence, it is said: ''If the rule of law is as contended for by defendant and appellant, and it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science.'' We think the evidence in the present case is sufficient to sustain the verdict of the jury.

It is also contended that the statements claimed by Mr. and Mrs. Walter to have been made to them by the

appellant, even if made, do not constitute evidence of fault or negligence on the part of Dr. England; that there is a broad distinction between an admission of negligence and an admission of mistake. *Donahoo* v. *Lovas,* 105 Cal. App. 705 [288 Pac. 698], *Markart* v. *Zeimer,* 67 Cal. App. 363 [227 Pac. 683], *Patterson* v. *Marcus,* 203 Cal. 550 [265 Pac. 222], *Rising* v. *Veatch,* 117 Cal. App. 404 [3 Pac. (2d) 1023], cited in support of appellant's claim, are all cases wherein it was charged that the doctor had made a mistake, but it was a mistake in diagnosis. It is the law that a doctor is not responsible for such error. In other words, a doctor is not liable for an honest mistake of judgment in making a diagnosis of his patient's ailment, unless it was negligently made. (*Patterson* v. *Marcus, supra.*)

In the case of *Phillips* v. *Powell,* 210 Cal. 39 [290 Pac. 441], it was held that certain admissions made by the defendants were not admissions of negligence, and, therefore, an instruction that the standard of learning and skill could be determined by such admissions was prejudicial. However, in the instant case, we have the hypothetical question propounded by the defendant to experts, from which it appears that one of the necessary elements in giving an anesthetic in a case such as this is that the needle requires from thirty to forty-five seconds from the commencement of the injection until finally completed, at least that is a fair inference to be drawn from such question and the answers thereto. The testimony of the plaintiffs is that the insertion took a second or two. As said in *Barham* v. *Widing, supra,* at page 215: "The jurors were entitled to accept the solution to which these circumstances led them, in preference, even, to positive statements of the defendant and his nurse to the contrary." See, also, *Roberts* v. *Parker, supra,* and *Scott* v. *Sciaroni,* 66 Cal. App. 577 [226 Pac. 827]. We are satisfied that as used by the defendant, the word "mistake" was synonymous with the word "negligence". The evidence also supports the verdict in that the plaintiff, Mrs. Walter, suffered, and still suffers, from the effect of the broken needle in her jaw.

If we are right in our conclusions as aforesaid, the court was justified in denying defendant's motion for a judgment notwithstanding the verdict.

It is further claimed that certain remarks of counsel for respondent, and certain testimony of the witness E. L. Walter, constituted such grievous error that the court should have granted appellant's motion for a mistrial; that such misconduct could not be cured by any admonition given by the court to the jury. During the progress of the trial, at the instance of his counsel, E. L. Walter testified that before the action was commenced he visited the office of the appellant and said to him: "Doctor, you and I and your wife and my wife have been friends and I don't want to do anything that is going to hurt you by any action on our part, because I know that if suit is brought it is going to hurt you," and I said, "I came to see you knowing that you are going to San Francisco, and ask you if you won't be man enough to go down there and tell your insurance company, whom I know you are insured with, that you did make a mistake on a friend of yours and all that friend asks is to be reimbursed for the expense (that we couldn't afford in the first place) and to be taken care of afterwards, getting that needle out and the necessary expenses that must accrue." At this point counsel for appellant assigned the asking of the question as to the conversation as prejudicial misconduct, and the giving of the answer an attempt and a successful attempt, by improper methods, to draw into the case the question of insurance. Reserving a ruling on the motion the trial court permitted the witness to finish his answer, as follows: "Well, Dr. England at that point broke down and tears came to his eyes and he said, 'I will. It is very decent of you to come in here and take that attitude that you have taken'; and he said, 'I'll go down to my insurance company when I am in San Francisco and will tell them that I have made a mistake and I'll be back either tomorrow or the next day and will come in and let you know what the results have been.'" The court denied the motion and stated: "The court does, however, wish to instruct the jury that reference to the insurance companies in this class of cases is not proper, except as they appear incidentally, and they should and are instructed to disregard all such evidence."

It is a general rule that in this class of cases reference to the fact that a defendant is indemnified by a policy of insurance is prejudicial error, and the evil effect upon the jury

of such a reference cannot be cured by striking out the testimony, nor by an admonition to the jury not to consider it in any way. (*Rising* v. *Veatch, supra; Squires* v. *Riffe,* 211 Cal. 370 [295 Pac. 517] ; *Citti* v. *Bava,* 204 Cal. 136 [266 Pac. 954].)   This rule, however, does not prevent such evidence being proper where the conversation involves an admission of responsibility.   (*King* v. *Wilson,* 116 Cal. App. 191 [2 Pac. (2d) 823] ; *Harju* v. *Market St. Ry. Co.,* 114 Cal. 138 [299 Pac. 788] ; *McPhee* v. *Lavin,* 183 Cal. 264 [191 Pac. 23] ; *Lahti* v. *McMenamin,* 204 Cal. 415 [268 Pac. 644].)   In the case before us the conversation amounted to an admission that the appellant had made a mistake.   We have heretofore held that this admission, when considered with all the testimony in the case, is subject to interpretation as an admission of negligence, and the jury were the judges of its effect.

The evidence having been properly admitted, we find no prejudicial error in referring to it in the argument to the jury.

Appellant also claims the court erred in not permitting him to cross-examine Mrs. Walter as to her social and club activities immediately following the accident, during which period she claimed to have been suffering severe pain from the effect of the embedded needle.   The court in effect stated that counsel had fully examined the witness on that subject, to which counsel replied: ''Well I think so, your Honor, but I don't know what the jury will think about it.''   An examination of the record discloses a very lengthy cross-examination.   Under the circumstances there was no error in limiting it.   (Sec. 2044, Code Civ. Proc.; *People* v. *Tou Jue,* 66 Cal. App. 235 [225 Pac. 759].)

It is further contended that the court permitted lay witnesses to testify concerning medical matters which could only be testified to by experts.   The plaintiff E. L. Walter was permitted, over objection, to testify that after the accident he was awakened night after night by his wife lying in bed crying with pain in her jaw.   That before the accident she was in good health physically and mentally.   Objection is also taken to the evidence of other witnesses claimed to be in the same category.   But none of this evidence is, in our opinion, subject to the objection.   It is said in 10 California Jurisprudence, page 978: ''Under one of

the exceptions to the general ruling excluding the opinion of nonexperts, the opinion of such a witness derived from observation may be received in connection with his statement of the facts upon which it is based. It is said that this exception applies to questions of . . . sickness and health.''

■ Complaint is made that the court erred in giving two instructions offered by the plaintiffs. One of these relates to evidence of negligence as a matter of common knowledge. The other, as to the necessity of following expert testimony in the absence of evidence of facts constituting common knowledge. Both instructions were approved in *Nelson* v. *Painless Parker,* 104 Cal. App. 770–775 [286 Pac. 1078], which, like the instant case, included both classes of evidence. They were properly given.

■ The court refused to give the jury a number of instructions offered by the defendant. The principal complaint in this behalf rests upon the failure of the court to give an instruction " . . . that a licensed dentist is presumed to have that degree of skill and learning required by law, and to exercise that degree of care and judgment in his treatment of and attention to the case. This presumption of law may be refuted by testimony on behalf of the plaintiffs, and as I have instructed you, by the testimony of competent witnesses, that is, dentists, or physicians and surgeons. If this presumption has not been overcome or dispelled, it is your duty to bring in a verdict for the defendant.'' It will be observed that this instruction requires that the presumption of skill and learning and their exercise must be overcome by the testimony of expert witnesses, thus ignoring the right of the jury to consider the testimony of lay witnesses on matters of common knowledge which the jury have a right to consider, and which are present in this case in determining the question of negligence of the defendant. Therefore, the refusal of the proposed instruction was warranted by the state of the record. Furthermore, an examination of all of the instructions contained in the transcript on appeal discloses that the jury were fully and fairly instructed upon all phases of the case including the application of expert testimony. There was no error in refusing to give the instruction. We deem it unnecessary to discuss any other questions. The defendant was accorded a fair and impartial trial. The jury decided the case upon competent and suffi-

cient evidence, and under well-settled principles of law we cannot disturb their verdict.

The order denying the motion for a judgment notwithstanding the verdict and the judgment are both affirmed.

Plummer, Acting P. J., and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 13, 1933, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 11, 1933.