[Civ. No. 2889. Fourth Dist. May 31, 1944.]

LEWIS W. DEAN, Respondent, v. LOUIS Q. DYER, Appellant.

Monroe & McInnis for Appellant.

Gray, Cary, Ames & Driscoll and Burton D. Wood for Respondent.

BARNARD, P. J.—This is a malpractice action. The defendant practiced medicine in San Diego, specializing in the treatment of the eye. On April 15, 1941, he removed a cataract from the plaintiff's right eye. The operation was apparently successful and on April 20th the plaintiff was discharged from a hospital in San Diego and taken to his home near Escondido, some 40 miles away. The defendant testified that at that time the plaintiff's eye "was all healed, as far as I could see" and that on that date the plaintiff "could see very good" and "quite clearly." The plaintiff returned to the defendant's office for inspection on April 22d and on April 24th. This action involves only what happened on the latter occasion.

The action was brought and tried upon the theory that on April 24th the defendant negligently put a caustic or corrosive substance into the plaintiff's eye, with the result that the sight thereof was destroyed. As a defense, the defendant contended that on April 24th he discovered a deep infection in plaintiff's eye which had caused "iritis," that he put nothing in the eye other than atropine, and that the loss of sight was caused by this infection. A jury brought in a verdict in favor of the plaintiff and the defendant has appealed from the judgment.

Appellant's main contention is that the evidence is insufficient to establish any negligence on his part. It is argued that there is no evidence to show that the respondent's eye was not infected when he came to appellant's office on April 24th; that the appellant's testimony that the only thing he put into respondent's eye on this occasion was a solution of atropine stands uncontradicted; that there is no evidence justifying an inference that some acid or corrosive substance must have been used; that these were all matters which

called for expert testimony; and that the evidence is not sufficient to overcome the explanation made by the appellant.

■ It cannot be said that the appellant's testimony, to the effect that the condition which developed in the respondent's eye was caused by an infection therein and that nothing but atropine was used on the occasion in question, stands uncontradicted. While he testified that the conditions he found in this eye on April 24th would not be observable to a layman and that he then used nothing but an atropine solution, there is evidence, including statements and conduct on his part, which justified contrary inferences and which raised a substantial conflict in the evidence.

The respondent testified that the doctor inspected his eye on April 22d and said it "was doing fine, healing good and clearing up"; that he could then count the fingers the doctor held up and could see the letters on his chart; that he then had no trouble with this eye, there were no secretions and the bandage remained perfectly dry; that on April 24th, when his wife changed the bandage, he could see everything in the kitchen; that on the afternoon of April 24th he went to appellant's office; that the appellant removed the bandage, commented on how well he was doing and remarked that he "believed it was doing as good or better than any eye he had ever operated on"; that he could see things in the office and saw the appellant take up an eyedropper and take something out of a bottle and put in the eye; that it "burned terribly" and he has never been able to see anything with that eye since; that the appellant told him it would quit burning in a few minutes; that the appellant then told him to come back on the 26th and said: "I don't think you will have to come back any more until I can fit you with glasses."

He then testified that on his way home his eye kept burning; that something kept running out of his eye and down on his face; that he kept wiping it off from under his mask; that this substance stung and smarted on his face; that this condition of pain existed all the way home and for a long time afterward; that he arrived home about four o'clock and lay down; that it pained pretty bad so he got up and walked the floor; that it was not long before his wife came home and wanted to know what was the matter with him; that he told her "the doctor put some medicine in my eye that burned like fire," and asked her to wash it out; that before she had time to do this someone knocked on the door; that his wife

opened the door and the appellant was there; that she asked him "What in the world brings you here" and the appellant replied: "Something terrible has happened"; that the appellant rushed in, jerked off his coat and threw it on the floor and got out two syringes, telling Mrs. Dean to boil them; that after he had washed his hands the appellant took the bandage off the eye and smelled it; that the bandage was wringing wet; that he told the doctor his eye was blind; that the appellant began working in his eye with a little stick he took from his medicine case; that he then worked something off the eye with the stick and with cotton; that he put the stick, cotton and the bandage in a little paper and put them in his medicine case; that the appellant then washed out his eye with boric acid, using a bulb syringe; that every time he would wash it he would smell it; that after it had been washed three or four times he told the appellant he could stand it no longer; that the appellant told him to let him wash it two or three times and he "would have that stuff all washed out"; that the appellant then gave him a "shot"; that he then suggested to the appellant that perhaps they should have another doctor and that he should go to a hospital; that to each of these suggestions the appellant replied "absolutely no"; that before he left the appellant told him that if he should get worse during the night not to call another doctor but to call him and he would come right out; that before he left the appellant said he would return the next night; that he returned the next morning, however, and also the next night; and that on each of these occasions he attempted to treat this eye.

Mrs. Dean testified that about 12:30 on the 24th she changed the bandage on this eye; that the eye then appeared clear with no cloudiness or redness; that her husband did not then complain of any pain or discomfort in his eye; that when she returned home from her work about 4:30 she found her husband walking the floor and looking pale; that shortly thereafter the appellant appeared at the door; that in response to her inquiry as to what brought him he stated "Oh, something terrible has happened"; that he asked for hot water and sterilized some syringes; that he removed the bandage, which was dripping wet; that this eye had a film over it, looked white and "just looked cooked"; that there were three or four big red streaks on his cheek which had not been there

before and which lasted three or four days; and that the white of the eye had bloodshot threads through it. Her testimony as to what the appellant then did is about the same as that given by her husband. She further testified that while the appellant was forcing boric acid water into the eye she told him he was opening the incision, and that he replied: "That is the way I want it"; that the appellant stated he had inquired his way to the Dean house at the drug store; that when he was preparing to give her husband a "shot" she heard the appellant swearing and asked him what it was about and he replied: "I am so sorry this happened"; that when the appellant returned the next morning he brought "lots of medicine," including seven bottles and a box of pills; that the eye then looked "white, just cooked, and the incision was wide open"; that the appellant returned again about 4:30 that day; and that the appellant directed that Mr. Dean be kept in a dark room where he remained for 65 days.

A neighbor, who had taken respondent to the appellant's office on April 24th, testified that on the trip there the respondent was in good spirits, laughed and talked and complained of no pain or discomfort; that on the trip home he had little to say, appeared to be in agony and kept wiping under his eyes; and that she was present at the Dean home when the appellant came on the evening of the 25th. When asked how the eye looked at that time she replied: "Well, where the white is it was all red and the blue part was like —oh, the best I could describe it, like a poached egg that has that scum over it."

In his deposition, the appellant testified that when the respondent came to his office on April 24th, he found the bandage "pretty dirty" and the eye "pretty red and inflamed." When examined at the trial he did not mention any dirty bandage but said he found evidences of an infection which would not be visible to a layman, that he was then "alarmed," and that he then "envisioned the possibility of the loss of the eye." This is contradicted by the casual manner in which he told the respondent to come to the office for a final inspection two days later, if the respondent's evidence is to be believed. The fact that the appellant made a sudden trip to the respondent's home 40 miles away, where he had not previously been, arriving approximately half an hour after the respondent reached there, is significant. The appellant's explanation of this was that he had given the

respondent instructions as to treatment for the eye but that he was not sure that he had given complete instructions. In view of the other evidence, this explanation is not entirely satisfactory. The appellant also testified that while inspecting the eye on April 24th he found an infection which constituted "iritis." He outlined the treatment for "iritis" and stated that "an eye with iritis must be handled rather gently." He also testified that he had never seen a case of iritis where a person lost his vision instantaneously. The treatment he outlined did not include the drastic washing out which was done immediately after his arrival at the Dean home on the 24th, as testified to by the other witnesses and confirmed by the appellant himself. There were a number of other inconsistencies and contradictions in the appellant's testimony which need not be enumerated, but which contributed to the existing conflict in the evidence. There was also some conflict with respect to the shape and appearance of some of the bottles which were on the appellant's tray when he inspected respondent's eye on April 24th. The appellant further testified that the solution of atropine, which he said he used on this occasion, would not cause the result which seems to have immediately followed.

It would serve no useful purpose to review the many cases cited. ▉ While expert evidence is usually essential in malpractice cases it is well settled that this is not necessary where it is common knowledge that the thing which happens is of a kind which does not ordinarily occur in the absence of negligence upon the part of the actor. In such cases, the question of negligence may be decided upon the general circumstances as shown by the evidence and in the light of common experience. (*Barham* v. *Widing*, 210 Cal. 206 [291 P. 173]; *Ales* v. *Ryan*, 8 Cal.2d 82 [64 P.2d 409].) ▉ Under the circumstances appearing here it was unnecessary to identify the substance which was put in the respondent's eye on April 24th. (*Ley* v. *Bishopp*, 88 Cal.App. 313 [263 P. 369]; *Gunning* v. *Cooley*, 281 U.S. 90 [50 S.Ct. 231, 74 L.Ed. 720].) No expert evidence was needed to demonstrate that something unusual happened. It was fully shown that the respondent's eye was in good condition before this substance was placed in it and that immediately afterward a sudden change took place, including the loss of sight in the eye. The appellant's own evidence is to the effect that atro-

pine, which he said he used, would not have had that effect and that even an infection or iritis would not have had that immediate effect. The evidence justifies an inference that some caustic substance was used and this is emphasized by the appellant's actions in very shortly thereafter hurrying to the respondent's home and in making unusual efforts to wash something out of the eye, and by what he there said. This, and the other evidence, would fully justify the inference that a mistake was made and that some harmful substance was put in this eye, and was sufficient to make out a prima facie case of negligence. The doctor's explanation was unsatisfactory in many ways and did not reasonably explain the sudden change which had taken place in this eye, the drastic change in his method of treatment or his greatly increased efforts to meet what could reasonably be interpreted as an entirely different situation which had arisen. The questions of fact presented were for the jury and the evidence is sufficient to sustain its finding.

What we have already said answers the appellant's second contention that since there was no competent evidence of negligence the court erred in permitting the verdict to stand.

It is next contended that the court erred in refusing to give an instruction to the general effect that the question of the character and suitability of the substance used by the appellant on the occasion in question must be determined upon the testimony of expert witnesses. Nothing further need be said in this connection. Also, that the court erred in refusing to give a requested instruction upon the burden of proof. The substance thereof was fully covered in other instructions. It is further argued that the court erred in giving certain general instructions as to direct and indirect evidence and as to inferences and presumptions. While it is conceded that these were correct statements of the law it is claimed that they were not applicable to the issues and that by giving them the court permitted the jury to infer that the appellant had been guilty of malpractice, basing such inference upon speculation and conjecture and with no competent testimony to support any such conclusion. This contention is without merit. It is also urged that the court erred in giving an instruction relative to expert witnesses. While it is admitted that the instruction was correct in itself it is argued that it was inapplicable here be-

cause, while the appellant gave his expert opinion on certain matters, there was no conflict in the expert evidence, and because the effect of the instruction was to single out testimony of the appellant and apply the rules of law to only one witness. There was some expert testimony and the fact that it came from a party to the action could not make an applicable instruction improper, and no possible prejudice appears.

It is next contended that the court erred in permitting the respondent's wife to testify that the appellant told them not to get another doctor and not to take the respondent to a hospital, and that it also erred in requiring the appellant to testify as an expert witness when called under section 2055 of the Code of Civil Procedure. With respect to the first two of these matters the only argument is that they were not within the issues. This testimony was brought out in showing the actions and statements of the appellant immediately after the act with which he was charged, and was properly admitted as being both relevant and material. The contention that the appellant could not be required to testify as an expert when called under section 2055 has now been decided to the contrary (*Lawless* v. *Calaway*, 24 Cal.2d 81 [147 P.2d 604]).

The final contention is that the amount of the judgment is excessive. The jury returned a verdict for $17,360. In connection with a motion for a new trial, and with the consent of the respondent, this amount was reduced to $8,500. It is argued that this amount is excessive because, while the operation to remove the cataract was apparently successful, it does not necessarily appear that the respondent would have enjoyed the sight of this eye regardless of what happened on April 24, and because it does not necessarily appear that the respondent has permanently lost the sight in this eye since he brought in no expert witness to testify to this effect.

The evidence justifies the inference that the operation had been successful and that the respondent would have had a reasonable use of this eye if the event of April 24th had not occurred. It appears that the respondent has been totally blind in that eye since that occurrence and there is evidence that on June 20, 1941, the appellant expressed the opinion that this eye was "dead" and that he would never see out of it again. The appellant did not dispute this at the trial

but then stated that he could not be certain that sight could not be restored without performing a surgical operation for the purpose of ascertaining the exact condition of the eye. The respondent was fifty-five years old at the time of the injury, he suffered pain for weeks, was kept in a dark room for sixty-five days and he has lost the sight of the eye. There is some evidence justifying the inference that this loss will be permanent and from the record before us it cannot be held that the amount of the judgment is such as to indicate that it was the result of passion or prejudice.

The judgment is affirmed.

Marks, J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 27, 1944.