The opinion and judgment were modified to read as above on December 13, 1949.

H. T. MOORE, Appellant, v. ELMER BELT, Respondent.

E. Briggs Howarth and Walter R. Trinkaus for Appellant.

Sheppard, Mullin, Richter & Balthis as Amici Curiae on behalf of Appellant.

Fulcher & Wynn, Gibson, Dunn & Crutcher and Phillip C. Sterry for Respondent.

Hartley F. Peart, Gus L. Baraty, Howard Hassard, George A. Smith, Alan L. Bonnington, Reed & Kirtland and Louis J. Regan as Amici Curiae on behalf of Respondent.

SHENK, J.—Appeal by the plaintiff from a judgment on a verdict for the defendant in an action to recover damages for alleged malpractice. The appeal is on a settled statement. Due to an admitted conflict in the testimony it is not contended that the evidence is insufficient to support the verdict. The plaintiff's principal assignments are that the court committed prejudicial error in the instructions on the issue of negligence and in rulings on the admission of evidence.

The defendant is a physician practicing in the county of Los Angeles and has specialized in urology since 1923. The plaintiff, an attorney, is 46 years old and resides in Los Angeles. He formerly lived in Texas. On June 7, 1944, he appeared at the defendant's office pursuant to an appointment. His medical history given at that time showed the following:

In childhood he experienced the usual children's diseases. In his youth he had trouble with his left testicle which was small and would draw up into the abdomen upon pressure. This condition continued throughout the years causing him pain and discomfort. Beginning about 1920 a sinus infection developed which gave him much distress. Drainages in 1921 quieted the area somewhat until 1930. The difficulty recurred and in 1932 he had a bone cutting operation which did not entirely remove the trouble. At times he had a slight rheumatic pain in the right wrist. Periodic pain centering in the lower abdominal region commenced about 1936. It was preceded by a slight nonvenereal urethral discharge which disappeared after treatment. X-ray and fluoroscopic examinations were made in El Paso and again in 1939 in Los Angeles in an attempt to locate the origin of the abdominal pain, and in 1942 the appendix was removed. But the difficulty remained and called for further study. For this purpose the plaintiff was sent by his personal physician to the defendant.

At the defendant's office the plaintiff was subjected to examination and tests of the prostatic secretion, the urine, and for syphilis. He was then prepared for cystoscopic examination which was conducted by the defendant with the use of instruments and fluids inserted through the ureters. X-ray pictures were taken. Before he departed the plaintiff was informed by the defendant that the tests showed negative results except for five per cent pus cells in the prostatic secretion which was stated to be normal, and that his trouble could not be traced to any infection or difficulty in the genito-urinary system.

The plaintiff worked at his office the following day and evening until 8 o'clock when he had a chill and went home. Chills and fever continued alternately throughout the night and the next day. The defendant was out of the city and the plaintiff called Dr. Hyde who took samples of urine to his laboratory for tests and later reported the results which were not given in evidence. Sulfa drugs were sent from the defendant's office for administration. The following day Dr. Guth of the defendant's staff called, made examinations and advised continuing the drugs. Chills and profuse sweating continued and the plaintiff was taken to a hospital where he was attended by Dr. Ebert from the defendant's office. Dr. Ebert informed the plaintiff that he was being treated for an acute infection of the urinary passages but it was not understood how the infection arose. The chills and fever abated on June 14th and on June 16th the plaintiff returned to his home where he was confined for 10 days. On June 27th, he reported at the defendant's office and after prostatic and urinary tests was told he had a 25 per cent infection. Subsequent tests showed the infection decreasing gradually to 10 per cent. He was informed that the defendant did not know the cause of the infection. The plaintiff then began treatment with his personal physician. Because of an apparent allergy to sulfa drugs, penicillin was substituted in the treatment and apparently proved more effective.

On the trial the plaintiff produced one expert witness, an autopsy surgeon in Los Angeles, who testified that in his opinion the 24 hours between the cystoscopic examination and the fever symptoms constituted an incubation period for bacteria introduced into the delicate channels by unsterile instruments or, assuming proper sterilization of the instruments, from the opening of the channels whose edges were not thoroughly cleansed; that the results showed a well-seated infection in the urinary tract which was not present prior to instrumentation.

· Witnesses produced by the defendant testified concerning standards of treatment and sterilization methods and stated that in their opinion the infection was not caused by any unsterile preparatory procedure nor introduced from outside sources in the conduct of the cystoscopic examination but, based on the prior medical history, was attributable to low-grade chronic infection in the genito-urinary tracts, probably prostatic in origin, or to the use of sulfa drugs, or to influenza from respiratory inflammation or sinus infection.

At the defendant's request the court charged the jury in substance that the defendant's negligence could not be presumed but must be based on the testimony of experts; also that the jury could not set up a standard but must be governed solely by the testimony of expert witnesses.

The plaintiff requested an instruction (based on B.A.J.I. 214-B Pocket Parts) embodying the substance of the foregoing instructions and adding that expert testimony was not required to establish a fact based on common knowledge that danger is involved where certain precautionary measures including sterilization are not followed, whereupon whether the condition was caused by negligence may be decided in the light of such common knowledge. The requested instruction was refused but at the plaintiff's request the jury was charged that if it be found that the plaintiff sustained injury as the result of the introduction by the defendant of a new infection, an inference arose that the proximate cause of the injury was some negligence or malpractice on the part of the defendant which it was incumbent upon him to rebut by clear, positive and uncontradicted evidence that the injury occurred without any failure of duty on his part.

The plaintiff contends that the instructions given were conflicting and confused the jury; that the correct theory of the case is that as a matter of common knowledge the result does not usually happen when sterilization has been proper; that expert testimony was not required to prove negligence; therefore that the instructions in conflict with his theory were erroneous, misleading and prejudicial.

On the other hand the defendant, supported by state and county medical associations as amici curiae, questions the propriety of any application of a doctrine based on common knowledge in the absence of the fact first established without conflict that the infection was introduced by the act of the defendant. It is therefore contended that the record presents issues of fact solely within the knowledge of experts and that the plaintiff's given instruction which incorporated a statement of the res ipsa loquitur doctrine was more favorable to him than the record warranted.

The given instructions embodied a statement of the general rule that the proper and usual practice in diagnosis and treatment is a question for experts and can be established only by their testimony. (*Perkins* v. *Trueblood*, 180 Cal. 437, 443 [181 P. 642]), and the exception declared in *Barham* v. *Wid-*

*ing,* 210 Cal. 206 [291 P. 173], and other cases relied on by the plaintiff.

In *Barham* v. *Widing* the defendant extracted a tooth from the plaintiff's jaw. An infection developed which from the evidence could be traced to the use of an unsterile hypodermic needle or solution inserted to anaesthetize the jaw. The jury was instructed that if the defendant used an unsterile needle or solution which proximately caused the infection the plaintiff should recover. It was claimed that the omission of the words "carelessly and negligently" was prejudicial error. This court affirmed the judgment entered on the verdict for the plaintiff and determined that the mere fact of infection following and traceable to improper sterilization was evidence of carelessness and negligence; that the court would take judicial notice that in common knowledge such a result does not follow proper sterilization and that observance of the ordinary standards would preclude the use of an unsterile needle or solution; therefore the omitted words were not necessary to a proper charge.

Declarations to similar effect and variously stated have been applied in many situations. (*Dierman* v. *Providence Hospital,* 31 Cal.2d 290 [188 P.2d 12] ; *Ybarra* v. *Spangard,* 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258] ; *Lawless* v. *Calaway,* 24 Cal.2d 81, 86 [147 P.2d 604] ; *Bellandi* v. *Park Sanitarium Assn.,* 214 Cal. 472, 480 [6 P.2d 508] ; *Meyer* v. *McNutt Hospital,* 173 Cal. 156 [159 P. 436] ; *Dean* v. *Dyer,* 64 Cal.App.2d 646, 653 [149 P.2d 288] ; *Mastro* v. *Kennedy,* 57 Cal.App.2d 499, 504 [134 P.2d 865] ; *Walter* v. *England,* 133 Cal.App. 676, 680 [24 P.2d 930] ; *Inderbitzen* v. *Lane Hospital,* 124 Cal.App. 462, 467 [12 P.2d 744, 13 P.2d 905].) In other cases the doctrine has been recognized. (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3] ; *Engelking* v. *Carlson,* 13 Cal.2d 216, 221 [88 P.2d 695] and cases cited; *Church* v. *Bloch,* 80 Cal.App.2d 542, 548-549 [182 P.2d 241] ; *Rising* v. *Veatch,* 117 Cal.App. 404, 408 [3 P.2d 1023] ; *Donahoo* v. *Lovas,* 105 Cal.App. 705, 709 [288 P. 698].)

In the cases cited where the doctrine was held applicable evidence that the defendant did not cause the injury was remote and it followed as a matter of common knowledge from the nature of the injury that the result would not happen without carelessness or negligence. In the present case the inference that the injury was not caused by the defendant, but from some source theretofore existing in the plaintiff's system, was not remote but could be drawn from substantial

evidence in the record. On the evidence of the plaintiff's medical history the jury was not required to but could reasonably conclude that the prior infection, and not any negligent act on the part of the defendant, was the proximate cause of the trouble. The inference based on common knowledge is. at the root of the res ipsa loquitur doctrine. Before it could be drawn under the facts of this case the jury would have to reject the hypothesis that the plaintiff's prior condition was the proximate cause. (Prosser, Torts, p. 295; Prosser, article *Res Ipsa Loquitur in California,* 37 Cal.L.Rev. 183, 201; *Ybarra* v. *Spangard, supra,* 25 Cal.2d at p. 489.) Omitted from the plaintiff's refused instruction but included in his given instruction covering the res ipsa loquitur doctrine, is the necessary element of causal connection between the act and the injury. ▮▮▮▮ An instruction based on the plaintiff's theory that the exception only should be applied would resolve in his favor the issue of causation and thereby take that question from the jury's consideration. The evidence on that issue was conflicting and the court correctly submitted the case to the jury with the inclusion of the element of causation, thereby calling for statements of both the general rule and the exception. (See *Barham* v. *Widing, supra,* 210 Cal. at p. 216; *Nelson* v. *Painless Parker,* 104 Cal.App. 770, 775 [286 P. 1078].) Since there was no real contradiction as to the applicable theories, it may not be said that the jury was misled to the prejudice of the plaintiff on a record of conflicting evidence containing substantial support for the jury's verdict, and this court is therefore not at liberty to disturb the result of the jury's deliberations.

It is urged that the trial court unduly limited the plaintiff's examination of his expert witness. It appeared from the testimony of this witness that he had practiced as an autopsy surgeon for 29 years, that he did not practice urology, did not conduct genito-urinary examinations in the diagnostic or treatment fields, and did not know the methods of practice therein, but that he had learning and knowledge of the anatomy and of infections in relation to the genito-urinary system. When this testimony was given and after consultation and offers of proof in chambers, the court excluded hypothetical questions addressed to this witness based on his knowledge of the existing standards in the practice of urology, but permitted one hypothetical question to elicit the witness' opinion as to the cause of the infection.

■ A medical expert is not qualified as a witness unless he is shown not only to have the required professional knowledge, learning and skill to express his opinion, but is also familiar with the standards required of physicians under similar circumstances. (*Sinz* v. *Owens, supra,* 33 Cal.2d at p. 753 et seq.) ■ A party is entitled to examine an expert witness as to his qualifications and experience so that the full weight to be accorded his testimony will become apparent. (*Salmon* v. *Rathjens,* 152 Cal. 290, 299 [92 P. 733].) ■ But in view of the witness' admitted lack of practice in urology the extent of the examination as to his qualifications in relation to the subject matter of his opinion was within the sound discretion of the trial court. (*Sinz* v. *Owens, supra,* 33 Cal. 2d at p. 753.) The witness gave a chronological account of his education and experience and demonstrated his anatomical knowledge as it related to the genito-urinary system. It does not appear that further examination either as to his qualifications or his opinion of the cause of infection would have accorded any greater weight to his testimony. The plaintiff was not unduly restricted on direct or rebuttal examination by rulings sustaining objections to further hypothetical questions which were repetitions of the question answered by the witness and to questions on subjects not within the limits of the witness' qualifications as determined by the court.
■ Likewise the plaintiff may not complain of prejudice by reason of the court's refusal to permit the witness to explain his "yes" answer to the question whether his opinion on the hypothetical case assumed competent manipulation of instruments in the examination conducted by the defendant. Inasmuch as the court properly ruled that the witness was not qualified to give his opinion concerning the existing standards in the practice of urology, an explanation of the answer was not necessary. No prejudicial error or abuse of discretion is shown.

The judgment is affirmed.

Edmonds, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent. I cannot agree with either the result or the reasoning of the majority opinion. This case was ably and correctly disposed of by the opinion of Justice Vallée in the District Court of Appeal, and with some additions and deletions, I adopt that opinion as follows (90 A.C.A. 248):

"Appellant's assignments of error are: (1) the court erred in giving instructions requested by respondent and in refusing to give instructions requested by appellant, (2) the court erred in sustaining objections to questions asked the expert called by appellant for the purpose of establishing his qualifications, in sustaining objections to hypothetical questions asked the expert, in not permitting him to explain a 'Yes' answer, and in sustaining objections to questions asked him on rebuttal which assumed facts developed by the defense.

"The evidence germane to the first assignment of error will be related. Appellant went to Dr. Belt's office on June 7, 1944, for a cystoscopic examination. At the time he was a man 41 years of age. After giving the doctor a history, he was partially disrobed, the doctor palpated his abdomen and examined his testicles. He was then taken to another room for further examinations and tests preparatory to the cystoscopic examination. He was disrobed and clothed with a surgical gown. His pulse and temperature were taken. A test was made of his hemoglobin. His lungs and teeth were examined. Samples of his urine were taken, tested and found negative. His blood pressure was taken. A syphilis test was made. It was negative. A prostatic massage was performed and a sample taken of the prostatic secretion.

"After a wait, appellant was taken to a cystoscopic examination room and assisted onto a table. The table was so constructed that he could be turned from a prone position to an erect standing position without being removed from the table. While on the table appellant could not see and did not know what was being done except what he could feel. A layman, called a technician, 26 years of age, in the absence of Dr. Belt, prepared appellant for instrumentation. The layman picked up a tray from a nurse in the next room. The tray contained an installator, swab, water tube, two syringes, a peroneal towel and a sheet. He washed appellant's male organ, injected an anesthetic therein and inserted a ¼-inch stopper to hold the anesthetic in place. Dr. Belt took a cystoscope from a tray in another room and went into the examination room. A cystoscope is an instrument about twice the length of a fountain pen, with a diameter smaller than a fountain pen, made of copper and nickel plated, with the end turned up and a hollow shaft. It was lubricated with a non-oily lubricant. The layman removed the stopper. Dr. Belt introduced

the cystoscope into the opening, inserted it through the organ into the bladder and observed the interior of the bladder. The ureter openings into the bladder and the interior of the bladder appeared normal in every respect. Catheters were inserted through the cystoscope into the bladder through both renal pelves and pushed through the ureter to the kidneys. The catheters had been threaded into the cystoscope by someone not named in the evidence. A specimen of urine was collected through the catheters into test tubes and when examined it was found that there was no bacteria or pus present. A dye solution was injected into each uretral catheter and X-rays taken while appellant was in a prone position and also while he was in a standing position and while instruments remained in his body. The catheters were withdrawn and the solution remaining in the ureter was allowed to trail to the bladder as far as the prostate level and X-ray pictures taken of the area. All X-ray pictures were negative.

*"Dr. Belt testified that: the examination showed appellant's urinary tract from the kidneys down to the prostate was in a normal condition; it was a textbook picture of normalcy; after the examination he told appellant that his genito-urinary system was negative.* He testified that fever which develops an unusual time after a cystoscopic examination is not the normal reaction therefrom. Dr. Belt told appellant that if any reaction occurred at all it would occur within two hours. He also told him that the examination was entirely negative, that the blood count, hemoglobin, heart pulse and respiration were normal. Dr. Belt told him that his prostate, prostatic secretion and urine were normal, that his prostate was normal in size, shape and consistency, that his bladder was normal, that both his prostate and bladder were negative as to any pathological condition, that his kidneys and ureters were normal, that he was a textbook picture of perfection.

"About 24 hours later—4 o'clock the next day—appellant began feeling odd. He began having chills about 8 o'clock that night. He had chills and fever all night and all the next day, June 9. On June 10, he received some medicines from Dr. Belt's office which he understood were sulfa drugs. He started to take the sulfa drugs the afternoon of June 10. He continued to have chills and fever on June 10 and 11. On June 11, Dr. Guth, an assistant of Dr. Belt, went to appellant's home, examined him and told him to continue taking the medicine. Appellant continued to have alternate chills and fever. His temperature became progressively higher, run-

ning to 105 degrees about 10 p. m. on June 11. He was then taken to a hospital on the advice of Dr. Belt's assistant. The chills and fever continued. The sulfa drugs were discontinued on June 13 at 2 :30 p. m. but the fever and chills persisted until June 14. He remained in the hospital until the afternoon of June 16.

"While in the hospital appellant was attended by Dr. Ebert, another assistant of Dr. Belt. Appellant, while in the hospital, asked Dr. Ebert what was *causing his severe chills and high fever*. Dr. Ebert replied, 'That's hard to say. *Everyone knows you have an acute infection of the urinary passages,* but I can't understand how it got there. But that is why you are being given the sulfa drugs and pyridium. These medicines are for infections of that kind." Dr. Ebert, although still in the employ of Dr. Belt, was not called as a witness.

"On June 27, when appellant was able to leave his home for the first time, he went to Dr. Belt's office. He was given a prostatic massage by Dr. Guth and samples of his urine were taken for tests. After the tests were completed, he asked Dr. Guth the results. Dr. Guth told him that the tests showed that he still had a 25 per cent infection. Appellant was given prostatic massages by Dr. Guth until July 28, 1944. On each occasion Dr. Guth told him that he had an infection present in the urinary tract but that the amount was gradually decreasing so that at the time of his last visit the test showed only 10 per cent. Dr. Belt was away from Los Angeles from June 9 to June 23. Sometime thereafter and while Dr. Guth was giving appellant a prostatic massage, Dr. Belt appeared and appellant said, 'Dr. Belt, Dr. Guth just told me that I still have 10% infection present. I didn't have any infection when I came in here in June and I don't see why I should have any now.' Dr. Belt replied that 10 per cent was within normal limits. Appellant then asked Dr. Belt what had caused the infection in the urinary tract and the severe chills and high fever. Dr. Belt replied, 'To tell the truth, I don't know.' Dr. Belt did not deny having made this answer to appellant's query. Dr. Guth was in Wisconsin at the time of the trial. His deposition was not taken.

"The expert called by appellant testified that the 24 hours between the time of the examination and the time appellant began to have chills and fever probably was an incubation period for bacteria introduced into the urinary tract in the preparation for, or in the making of the examination, that

the introduction was evidently due to some defective condition of the instruments or carrying in from the opening of the meatus (the canal in the male organ), whose edges were not thoroughly cleansed, and that the treatment given in the hospital was for an infection of the urinary tract.

"As we read the record, there is no evidence that either the stopper or the cystoscope or the catheters used in the examination were sterilized before insertion into appellant's body. Neither the lay technician nor Dr. Belt sterilized any one of them or saw any one of them sterilized. No one testified that he sterilized any one of them. On the other hand, there is no direct evidence that they were not sterilized.

"Appellant's contention is stated in his brief. He says, '(a) His genito-urinary system was in a healthy and normal condition on June 7, 1944, when he reported to respondent for a urological examination, every part of that system being free of infection of every kind and description. This was established by the records and testimony of respondent which showed that *immediately prior* to the cystoscopic examination and on the same date appellant was given various tests, including tests of his urine, prostatic secretion, blood etc., all of which were negative and showed no infection present and, further, that the urological examination disclosed appellant's genito-urinary system to be in a healthy and normal condition. (b) About 24 hours after the cystoscopic examination had been completed by respondent, symptoms appeared showing that an infection had developed which the evidence established was within the confines of appellant's genito-urinary system. Appellant testified to the appearance of such symptoms approximately 24 hours after the examination. It was shown that 24 hours was the normal incubation period for a new infection of this type. And the fact that such infection which did not exist immediately before the examination, did exist approximately 24 hours after the examination, was established by the uncontradicted admissions of respondent and his assistants, by the nature of the treatment given, and also by expert testimony offered through Dr. Webb. (c) This infection had been caused by infectious matter which had been carried into appellant's urinary tract during the urological examination. Proof of (a) and (b) give rise to this inference which is further and directly established by the expert testimony of Dr. Webb. (d) There was no issue raised regarding the professional skill or learning of the respondent. (e) The question involved was whether respondent or his employees or

assistants were negligent in failing to effect and maintain proper sterilization for such examination. This negligence was established as a question of fact by proof of (a), (b), and (c), under the principles of *Barham* v. *Widing*, 210 Cal. 206 [291 P. 173], and also by the inference of such negligence arising under the doctrine of res ipsa loquitur as announced in *Ybarra* v. *Spangard*, 25 Cal.2d 486 [154 P.2d 687, 162 A.L.R. 1258].'

''The evidence which has been related puts the case squarely within the doctrine of *Barham* v. *Widing*, 210 Cal. 206 [291 P. 173]. In that case the defendant, a licensed dentist, extracted the left lower molar tooth of the plaintiff. In order to operate a local anesthetic was administered by means of a hypodermic injection of novocaine. The needle was twice inserted in the gum of plaintiff at a point over the ramus or ascending prong of the left lower jawbone near the diseased tooth. After five or six days an infection of the gum and jaw developed. A physician testified that the locality of the primary infection was the point where the hypodermic needle had been inserted in the gum, that it 'was the center of the abscess; it was deep, very deep, so that it must have been necessary that the infection was introduced . . . on a needle, or perhaps an unsterile solution, because the pus was found very, very deep,' and that from his examination of the socket from which the tooth had been removed the socket was not the seat of the infection. The plaintiff had judgment. On appeal the defendant contended that 'the judgment is not supported by the evidence since there is a total absence of medical expert testimony to the effect that the operation and treatment of the patient in the extracting of the tooth did not conform to the standard accepted method of the profession in that vicinity.'

''In affirming the judgment the court stated, page 213: 'The appellant asserts that the evidence is not sufficient to establish negligence on his part because there is no direct testimony that the needle or solution which was used in administering the anesthetic was unsterile; that a dentist, like a physician, is required to have and use only the degree of learning and skill which is ordinarily possessed by the dentists of good professional reputation in that locality. This is the rule with respect to physicians. (*Hesler* v. *California Hospital Co.*, 178 Cal. 764 [174 P. 654].) Undoubtedly the same rule applies to dentists. The jury was clearly instructed to this effect. It is equally true that cases which depend upon

knowledge of the scientific effect of medicine, or the result of surgery, must ordinarily be established by expert testimony of physicians and surgeons. (*Perkins* v. *Trueblood*, 180 Cal. 437 [181 P. 642].) This rule, however, applies only to such facts as are peculiarly within the knowledge of such professional experts and not to facts which may be ascertained by the ordinary use of the senses of a nonexpert . . . [p. 214.] The judgment in this case must be supported, if at all, upon the theory of appellant's negligence in failing to sterilize his hypodermic needle and the mouth and gum of the patient before performing the operation of extracting the tooth. It is true that both the dentist and his nurse testified that the usual process of sterilization was followed. It is equally true that there is no direct evidence that he failed to sterilize either the needle or the surface of the flesh where it was inserted. Barham does state that he did not remember that the dentist sterilized his mouth or gum.

" 'Under the circumstances of this case there is a remote possibility that the infection developed from some cause other than the defendant's failure to sterilize the needle or the gum into which it was inserted, but the evidence is sufficient upon which to warrant the jury in finding that it was caused by his negligence in failing to follow these reasonable precautions in spite of his testimony to the contrary. The jurors were entitled to accept the solution to which these circumstances led them, in preference, even, to the positive statements of the defendant and his nurse to the contrary. After the verdict of a jury has been fairly rendered, all the circumstances of the case, together with every reasonable inference which may be drawn therefrom, will be marshalled in support of the judgment. Because of the very subtleness of the origin and development of disease, less certainty is required in proof thereof. As the court says in the case of *Dimock* v. *Miller*, 202 Cal. 668, 671 [262 P. 311, 312] :

" ' "If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science."

" 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion . . .

" 'In this case no question is raised regarding the professional skill of the dentist. It is conceded that he was reasonably learned and skilful in his profession. But it is asserted that he was negligent in failing to sterilize the hypodermic needle and the gum into which he inserted the instrument. There is no conflict regarding the fact that infection of the jaw caused the injuries to Barham. It is conclusive that this infection developed within a few days after the operation on the ramus of the jaw at just the point where the needle was inserted, and not in the socket from which the tooth had been removed . . .

" '[p. 216.] It was not necessary for any dentist or physician to state that the conduct of the defendant was negligent or in conflict with the usual established practice of the profession in that vicinity to administer a local anesthetic for the purpose of extracting a tooth without sterilizing the needle, or the flesh into which it is inserted. The court will take judicial knowledge of the necessity to use ordinary care to procure sterilization under such circumstances. This case was tried upon the theory that everyone concerned recognized this duty. We are, therefore, of the opinion that the evidence will support the judgment in this regard.' (See, also, *McBride* v. *Saylin*, 6 Cal.2d 134 [56 P.2d 941]; *Inderbitzen* v. *Lane Hospital*, 124 Cal.App. 462 [12 P.2d 744, 13 P.2d 905]; *Thomsen* v. *Burgeson*, 26 Cal.App.2d 235 [79 P.2d 136]; *Anderson* v. *Stump*, 42 Cal.App.2d 761 [109 P.2d 1027]; *Mastro* v. *Kennedy*, 57 Cal.App.2d 499, 504 [134 P.2d 865]; *Dean* v. *Dyer*, 64 Cal.App.2d 646 [149 P.2d 288]; *Clemens* v. *Smith*, 170 Ore. 400 [134 P.2d 424]; *Drakes* v. *Tulloch*, 220 Mass. 256 [108 N.E. 916]; *Hafemann* v. *Seymer*, 195 Wis. 625 [219 N.W. 375]; *Swanson* v. *Hood*, 99 Wash. 506 [170 P. 135, 137].)

"In the Barham case a physician testified as an expert not that the conduct of the dentist was negligent or in conflict with the degree of care and skill ordinarily exercised by dentists in that vicinity, but simply to establish that the infection in the plaintiff's jaw was caused by an unsterile hypodermic needle or by an unsterile solution. In the case at bar appellant's expert testified merely for the purpose of establishing that the infection in appellant's urinary tract was caused by an unsterile instrument or that the parts of appellant's body into and through which the instruments were inserted had not been completely sterilized. The purpose of the expert testimony was precisely the same in each case.

"There is no difference between the facts of the Barham case and the facts of the case at bar. In the Barham case a needle was inserted into the gum and a solution injected. Five or six days later an infection appeared. The point of infection was the place where the needle was inserted. It was held that, without expert testimony, the jury could infer negligence. *Here, instruments were inserted into the male organ and the urinary tract and a solution injected. Twenty-four hours later an infection appeared. The point of infection was the urinary tract.* The jury, without expert testimony, could infer negligence. The evidence in the present case makes for a stronger inference of negligence than that in the Barham case. In that case there was no evidence that the gum was not infected at the time the needle was inserted and the solution injected. *Here the evidence—with the exception of the opinions of two defense experts which were contrary to the testimony of Dr. Belt that appellant's genito-urinary system was negative—is without conflict that the urinary tract was in a healthy and normal condition and free from infection at the time the instruments were inserted and the solution injected.* In the Barham case the infection did not appear until five or six days after the operation. Here the infection appeared about 24 hours after the examination.

"With the evidence stated before the jury, the court at the request of respondent gave the following instructions: (1) 'Negligence upon the part of a physician *is never to be presumed,* and in the absence of expert testimony to the contrary, it is to be presumed that a physician possesses and has exercised the requisite degree of skill and care in examining a patient.' (2) 'In determining the question of whether the defendant was guilty of negligence as alleged in the complaint *you cannot and must not* set up a standard of your own but must be governed in that regard *solely* by the testimony of expert witnesses who have appeared and testified in this case.' Under these instructions the jury was not permitted to determine for themselves that failure to properly sterilize the instruments inserted into the appellant's body or failure to properly sterilize the parts of the body through which the instruments were inserted, or both, was negligence. Failure on the part of a physician in either of these respects is negligence as a matter of common knowledge. There is no law, as applied to the facts of this case, which requires that the jury in determining these questions be governed solely by the tsetimony of expert witnesses. The practical effect of these

instructions was to direct the jury to return a verdict for the respondent . . .

"The court refused to give the following instructions requested by appellant: (1) 'In determining whether defendant's learning, skill and conduct fulfilled the duties imposed on him by law, as they have been stated to you, you are not permitted to set up arbitrarily a standard of your own. The standard, I remind you, was set up by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing, in the same locality at the same time. It follows, therefore, that except as hereinafter explained the only way you may properly learn that standard, is through evidence presented in this trial by physicians and surgeons called as expert witnesses.

" 'However, there is this exception to the rule just stated: when it is a matter of common knowledge that danger is involved in certain conditions or in a failure to maintain certain conditions or to take certain precautionary measures, as, for instance, failure to perform the commonly known duties of cleanliness or sterilization, expert testimony is not required to establish such a fact, but it may be judicially noticed as a part of that fund of common knowledge shared by us with our fellow citizens generally.

" 'This exception may be otherwise stated as follows: When it is common knowledge that an event or a circumstance that has happened to or developed in a patient is of the kind that ordinarily does not occur in the absence of negligence on the part of the physician attending him, the question whether or not the condition was caused by negligence may be decided from the general circumstances as shown by the evidence and in the light of common experience and reason.' . . .

" (2) 'If you believe from the preponderance of the evidence that defendant, Elmer Belt, or any of his agents or employees, negligently used or employed either unsterilized instruments or solutions in the examination of the plaintiff or in the injecting into him of such solutions and that as the proximate result thereof infection was introduced into plaintiff thereby injuring him, plaintiff is entitled to recover from defendant, Elmer Belt, his damages herein in such sum as in your judgment, considering all of the evidence, will justly compensate him for any damage you believe him to have sustained as the proximate result thereof.' In *Pierce* v. *Paterson*, 50 Cal.App. 2d 486, 489 [123 P.2d 544], the court quoted with approval

from *Sim* v. *Weeks,* 7 Cal.App.2d 28 [45 P.2d 350], as follows:
' "It is well settled that a physician and surgeon cannot be
held to guarantee the results of his professional services.
'However, it is equally well settled that in undertaking a
treatment of a patient the practitioner impliedly contracts
and represents *not only* that he possesses the reasonable degree
of skill and learning possessed by others of his profession in
the locality, *but that he will use reasonable and ordinary care
and skill in the application of such knowledge to accomplish
the purpose for which he is employed;* and that if injury is
caused by want of such skill or care on his part he is liable
for the consequences which follow. (*Houghton* v. *Dickson,*
29 Cal.App. 321 [155 P. 128]; *Nelson* v. *Painless Parker,* 104
Cal.App. 770 [286 P. 1078]; *Perkins* v. *Trueblood,* 180 Cal.
437 [181 P. 642]; *Hesler* v. *California Hospital Co.,* 178 Cal.
764 [174 P. 654]; *Ley* v. *Bishopp,* 88 Cal.App. 313 [263 P.
369]; *Patterson* v. *Marcus,* 203 Cal. 550 [265 P. 222].)" '
(Italics added.) Appellant does not contend that respondent
did not have the requisite knowledge and skill. His contention
is that respondent was negligent in no proper sterilization.
Where the evidence conflicts, each party is entitled to have the
law given to the jury which is applicable to his theory of
the case and the testimony of his witnesses. (*Kelley* v. *City
etc. of San Francisco,* 58 Cal.App.2d 872, 876 [137 P.2d 719];
*Buckley* v. *Shell Chemical Co., Ltd.,* 32 Cal.App.2d 209, 216
[89 P.2d 453]; *Dowdall* v. *Gilmore Oil Co., Ltd.,* 18 Cal.App.
2d 1, 5 [62 P.2d 1051]; *Renton, Holmes & Co.* v. *Monnier,* 77
Cal. 449, 455 [19 P. 820].) This injunction is not met when
the instructions remove that theory from consideration of the
jury. (*Morrow* v. *Mendleson,* 15 Cal.App.2d 15, 21 [58 P.2d
1302].) It is the duty of the court to give instructions ex-
pounding the law on every reasonable theory of the case find-
ing support in the evidence. (*Megee* v. *Fasulis,* 65 Cal.App.
2d 94, 101 [150 P.2d 281].)

"The evidence, without the testimony of experts, was suffi-
cient to warrant the jury in finding that the infection was
caused by the negligence of respondent. It was, therefore,
prejudicial error to give the two instructions requested by
respondent and to refuse to give the two instructions requested
by appellant."

The instructions that were given as above quoted unequivo-
cally removed the doctrine of res ipsa loquitur from the case.
No other interpretation thereof is possible. The instruction
which was given on that subject and upon which the majority

rely as curing the questioned instruction, is not accurate and could not have removed the positive impression given to the jury by the erroneous instruction. As phrased in the majority opinion, it read: ". . . that if it be found that the plaintiff sustained injury as the result of the introduction by the defendant of a new infection, an inference arose that the proximate cause of the injury was some negligence or malpractice on the part of the defendant which it was incumbent upon him to rebut by clear, positive and uncontradicted evidence that the injury occurred without any failure of duty on his part." The instruction given, in fact, reads: "If, and only in the event, you should find that plaintiff, H. T. MOORE, sustained injury as the result of the introduction by defendant, ELMER BELT, or any of his agents or employees, of a new infection you are instructed as follows: An inference arises that the proximate cause of such injury was some negligence or malpractice on the part of the defendant, ELMER BELT, or his agents or employees. That inference is a form of evidence, and if there is none other tending to overthrow it, or if the inference preponderates over contrary evidence, it warrants a verdict in favor of plaintiff. Therefore, you should weigh any evidence tending to overcome that inference, bearing in mind that it is incumbent upon the defendant to rebut the inference by showing that the injury in question occurred without being proximately caused by any failure of duty on his part, or on the part of any of his agents or employees.

"You are instructed that where an inference is permitted by law, that such inference is only a species of evidence, and where such inference is rebutted by clear, positive and uncontradicted evidence, then such inference is dispelled and disappears from the case." Manifestly, the instruction was in square conflict with the instruction on expert testimony and its effect would be erased from the minds of the jury. It would indicate to the jury that expert evidence was required under all circumstances.

In criticizing the instruction on res ipsa loquitur offered by plaintiff (but refused) the majority states that it omitted the requirement of proximate cause. While such issue is not mentioned in the instruction, *it had no place there*, for it dealt solely with the evidence required to establish negligence. It was not a formula instruction. It reads: "In determining whether defendant's learning, skill and conduct fulfilled the duties imposed on him by law, as they have been stated to

you, you are not permitted to set up arbitrarily a standard of your own. The standard, I remind you, was set up by the learning, skill and care ordinarily possessed and practiced by others of the same profession in good standing in the same locality at the same time. It follows, therefore, that except as hereinafter explained the only way you may properly learn that standard, is through evidence presented in this trial by physicians and surgeons called as expert witnesses.

''However, there is this exception to the rule just stated: when it is a matter of common knowledge that danger is involved in certain conditions or to take certain precautionary measures, as, for instance, failure to perform the commonly known duties of cleanliness or sterilization, expert testimony is not required to establish such a fact, but it may be judicially noticed as a part of that fund of common knowledge shared by us with our fellow citizens generally.

''This exception may be otherwise stated as follows: When it is common knowledge that an event or a circumstance that has happened to or developed in a patient is of the kind that ordinarily does not occur in the absence of negligence on the part of the physician attending him, the question whether or not the condition was caused by negligence may be decided from the general circumstances as shown by the evidence and in the light of common experience and reason.'' The subject of proximate cause was properly and adequately covered in other instructions.

The majority opinion, in an endeavor to escape the holdings in *Barham* v. *Widing,* 210 Cal. 206 [291 P. 173], and other cases cited in connection therewith, has this to say: ''In the cases cited where the doctrine was held applicable *evidence that the defendant did not cause the injury was remote* and it followed as a matter of common knowledge from the nature of the injury that the result would not happen without carelessness or negligence. In the present case the inference that the injury was not caused by the defendant, but from some source theretofore existing in the plaintiff's system, *was not remote* but could be drawn from substantial evidence in the record. Therefore the plaintiff has not necessarily brought the injury home to the defendant. Before the compelling inference based on common knowledge, which is at the root of the res ipsa loquitur doctrine, would be justified it became necessary for the plaintiff to eliminate himself as a proximate cause of the injury.'' The evidence was not ''remote'' that the defendant did not cause the injury in the cited cases. In

the Barham case *the defendant and his nurse testified positively that the needle was sterilized.* The same is true of *Bellandi* v. *Park Sanitarium Assn.,* 214 Cal. 472 [6 P.2d 508]; *Meyer* v. *McNutt Hospital,* 173 Cal. 156 [159 P. 436]; *Dean* v. *Dyer,* 64 Cal.App.2d 646 [149 P.2d 288]; and *Mastro* v. *Kennedy,* 57 Cal.App.2d 499 [134 P.2d 865]. If it is meant by the quoted statement that all the evidence must "necessarily" show that defendant caused the injury, and that similarly it must all show that some independent physical condition of plaintiff was not the cause, then we have some strange law on res ipsa loquitur. The fallacy of the reasoning is pointed out in *Mastro* v. *Kennedy, supra.* There plaintiff suffered an infection in the jaw after the dentist had removed a tooth, and in the process administered a painkiller by hypodermic needle. The court there said: "We may also accept as established facts, that immediately after the extraction there was no infection on the roots of the tooth nor in the sockets; that a serious infection set in which caused plaintiff much suffering and expense over a period of two years.

"The case of *Barham* v. *Widing,* 210 Cal. 206 [291 P. 173], has features quite similar to those of the instant case. There, a dentist was accused of malpractice because he failed to sterilize the hypodermic needle used in injecting an anesthetic, and to sterilize the gums before extracting a tooth . . . [quoting from *Barham* v. *Widing, supra*]: 'As the court says in the case of *Dimock* v. *Miller,* 202 Cal. 668, 671 [262 P. 311, 312]:

" ' "If . . . it is necessary to demonstrate conclusively and beyond the possibility of a doubt that the negligence resulted in the injury, it would never be possible to recover in a case of negligence in the practice of a profession which is not an exact science."

" 'It is not necessary in the trial of civil cases that the circumstances shall establish the negligence of the defendant as the proximate cause of injury with such absolute certainty as to exclude every other conclusion. It is sufficient if there is substantial evidence upon which to reasonably support the judgment . . .'

"Defendants seek to distinguish the instant case from the Barham case, because there, the infection started from the exact spot of the injection, while in this case it was in the

general locality but not necessarily in the exact spot of the injections. This distinction is too tenuous to be sound. Here, the infection was in the region where the needle pierced the unsterilized gums, and the reasonable inference might follow, if drawn by the jury, that a germ on the unsterile gums was carried into the tissue on the needle and caused the infection. The result of an unsterile condition is a matter of common knowledge under the cases already cited.

"... The danger of infection from an unsterile instrument, or a dirty field of operation, is a matter of such common knowledge that a jury is authorized to draw the reasonable inference that an infection was caused by negligence where an unsterile instrument is used, or the operative field is not properly sterilized ... [cases cited].

"In *Roberts* v. *Parker*, 121 Cal.App. 264 [8 P.2d 908], a dentist was sued for malpractice where osteomyelitis of the jawbone set in after an operation where no X-ray had been taken to determine the condition of the field of operation. Experts testified that under the standards of good practice prevailing in the community an X-ray should have been taken before the tooth was extracted. There was evidence introduced on behalf of the defendant tending to prove that the disease had its source other than in the extraction of a tooth. It was argued that there was nothing to show that the failure to use due care on the part of the dentist was the proximate cause of the osteomyelitis. In disposing of this argument the court said:

" 'Therefore, if in spite of the testimony tending to show a different origin of the disease there be testimony to sustain the opposite conclusion which has been reached by the jury, its verdict must be sustained. In other words after the verdict of the jury has been fairly rendered, all the circumstances of the case, together with any reasonable inference which may be drawn therefrom, will be marshaled in support of the judgment. (*Barham* v. *Widing, supra.*) Measured by the foregoing rules the circumstances of the present case are legally sufficient to sustain the jury's verdict. (*Dimock* v. *Miller, supra*; *Barham* v. *Widing, supra*; *Ley* v. *Bishopp, supra.*)' "

There is clearly no basis for a distinction between the case at bar and *Barham* v. *Widing, supra,* so far as the applicability of the doctrine of res ipsa loquitur is concerned, and the attempted distinction in the majority opinion will not stand the test of intelligent unbiased scrutiny. If this doc-

trine is applicable to this case, then there can be no question but that the jury was erroneously instructed, and that such error was prejudicial to plaintiff.

I would, therefore, reverse the judgment.

TRAYNOR, J., Dissenting.—I cannot agree that it was not prejudicially erroneous for the trial court to limit the testimony of plaintiff's only expert witness. In a field of law in which expert testimony is essential, the rulings below deprived plaintiff of a fair opportunity to prove the allegations of his complaint.

It was necessary for plaintiff to establish by competent evidence that (1) the infection was centered in the genito-urinary tract, (2) there was no infection, latent or chronic, when defendant made the examination, and that (3) the infection was caused by defendant's failure to exercise due care in the conduct of the examination, particularly in the sterilization of the instruments used.

Plaintiff does not dispute that there was no direct evidence tending to establish that defendant was negligent. It was not essential that he produce such evidence. Upon proof that the infection originated in the area examined and that it was not present before the examination, the jury could reasonably infer that the infection was introduced by the examination and therefore caused by the negligence of the defendant. It is common knowledge that infections do not ordinarily occur during medical treatment unless there is negligence. (*Barham* v. *Widing*, 210 Cal. 206, 216 [291 P. 173].) If the plaintiff establishes by expert testimony that his infection arose during medical treatment and that it would not ordinarily arise in the absence of negligent treatment, the jury may infer negligence on the basis of res ipsa loquitur. (*Sinz* v. *Owens*, 33 Cal.2d 749, 753 [205 P.2d 3] ; *Bellandi* v. *Park Sanitarium Assn.*, 214 Cal. 472, 480 [6 P.2d 508] ; *Barham* v. *Widing, supra.*)

Plaintiff could rely upon res ipsa loquitur, however, only if he established by expert testimony the first two elements of his case, the location of the infection and the nature of its origin, which are not matters of common knowledge. (*Perkins* v. *Trueblood*, 180 Cal. 437 [181 P. 642] ; *Sim* v. *Weeks*, 7 Cal.App.2d 28 [45 P.2d 350] ; *Slimak* v. *Foster*, 106 Conn. 366 [138 A. 153] ; *Christe* v. *Callahan*, 124 F.2d 825 ; see cases collected in 141 A.L.R. 5-50.)

Plaintiff introduced the testimony of Dr. Frank Webb. After plaintiff's counsel had interrogated Dr. Webb about his educational background and professional experience defense counsel raised doubts as to the witness's qualifications. The trial court permitted Dr. Webb to answer only one hypothetical question based on evidence before the court. He was not permitted to testify about his experience with diseases and infections of the genito-urinary tract, although the offer of proof in chambers indicated that he had considerable knowledge thereof. Plaintiff's counsel made it clear that "we are not asking the witness to testify as to the procedure that was used. We are asking him to testify as to the cause and nature of this infection." The trial court nonetheless refused to permit any further questioning about the location and nature of the infection upon defense counsel's objection that the witness was not an expert in the performance of cystoscopic examinations and had not seen one performed in Los Angeles in 1944. This ruling precluded the witness from testifying that the infection was not caused by a septic condition in the tract at the time of the examination and that the condition was not a local or systemic one originating before the examination. Plaintiff's case depended upon his ability to disprove those possibilities.

During the course of his examination, the witness stated that he assumed the examination had been competently conducted. On cross-examination, defense counsel asked the witness:

"Q. Doctor, from the hypothetical question that was propounded to you you assumed that the cystoscopic examination was made very competently and very thoroughly, did you not?

"A. Manipulation of the instruments or manual—what I mean to say is that the instruments or the manual manipulation of them was evidently very good.

"MR. STERRY [defense counsel]: I move that the answer be stricken as not responsive to the question.

"Will you read the question?

"(The reporter reads the last question.)

"A. I assumed that——

"Q. Will you just answer that yes or no, doctor?

"A. I can answer that yes.

"MR. STERRY: That is all."

On redirect examination, plaintiff's counsel asked Dr. Webb how he would explain his answer. Upon objection, the court refused to permit an answer to the question on the ground

that there was no ambiguity in defense counsel's question or in the witness's answer. The record does not sustain that holding. From the offer of proof in chambers, it appears that Dr. Webb meant to testify only that the actual physical conduct of the examination was competent. He did not intend by that statement to express an opinion about the sterilization technique before the examination. Since he was not permitted to make that explanation, the jury was left with the impression that plaintiff's only expert witness approved defendant's conduct of the examination in all its phases. The prejudicial effect of the trial court's ruling is readily apparent. It has been repeatedly held that the refusal of a trial court to permit the witness to explain a yes or no answer is reversible error. (*McGuire* v. *Baird*, 9 Cal.2d 353, 355-356 [70 P.2d 915] ; *Webber* v. *Park Auto Transportation Co.*, 138 Wash. 325 [244 P. 718] ; 58 Am.Jur. 321.)

The trial court refused to permit the plaintiff's witness to answer more than a single hypothetical question and expressed doubt as to his competence to testify at all. The approval of that ruling by the majority opinion throws an overwhelming burden of proof on the plaintiff in malpractice cases. The majority opinion states that the exclusion of Dr. Webb's testimony was not erroneous for the reason that ''A medical expert is not qualified as a witness unless he is shown not only to have the required professional knowledge, learning and skill to express his opinion, but is also familiar with the standards required of physicians under similar circumstances.'' This statement and the cases cited in its support are inapplicable to the present case. It may be conceded that a medical expert called to testify that a defendant did not exercise that degree of care and skill ordinarily exercised by members of the profession under similar circumstances must be familiar with the standard of care prevalent among the members of the profession. A medical practitioner who testifies as to the standard of care ordinarily exercised by a specialist in a given case must either be a specialist himself or must show familiarity with the methods of such specialists. (*McGuire* v. *Baird*, 9 Cal.2d 353, 356 [70 P.2d 915] ; *Sinz* v. *Owens*, 33 Cal.2d 749, 753 [205 P.2d 3].) Dr. Webb, however, did not ''testify to the degree of care against which the treatment given is to be measured.'' (*Sinz* v. *Owens*, 33 Cal.2d 749, 753 [205 P.2d 3].) He was called to testify solely as to the location and nature of the infection, matters within the

province of any competent medical practitioner. His degree of familiarity with cystoscopy technique and the conduct of cystoscopic examinations is irrelevant, for he was not called to testify about the technique or the standard of conduct of the examination. "The law does not require the best possible kind of a witness, but only persons of such qualifications as the community daily and reasonably relies upon in seeking medical advice . . . the ordinary medical practitioner should be received on all matters as to which a regular medical training necessarily involves some general knowledge." (2 Wigmore, Evidence, § 569, p. 665.) When the subject of inquiry is not the required standard of care but the nature of an ailment or its location, "a physician of practice and experience is an expert and . . . it is not necessary that a witness of this class should have made the particular disease involved in any inquiry a specialty in order to make his testimony admissible as an expert." (*Drucker* v. *Philadelphia Dairy Products Co., Inc.,* 35 Del. 437, 441 [166 A. 796]; *Meiselman* v. *Crown Heights Hospital,* 285 N.Y. 389, 398 [34 N.E.2d 367]; *Johnson* v. *Winston,* 68 Neb. 425, 430 [94 N.W. 607]; *Young* v. *Stevens,* 132 N.J.L. 124, 126 [39 A.2d 115]; *Hathaway's Administrator* v. *National Life Insurance Co.,* 48 Vt. 335, 351; *Swanson* v. *Hood,* 99 Wash. 506, 515, 516 [170 P. 135].)

The testimony that plaintiff's witness was allowed to present demonstrates that he is a competent practicing physician familiar with general medical practice, that he has kept abreast of the latest developments by research and study, and that he has had experience with diseases and infections of the genito-urinary tract. Treatment of infections and knowledge of their nature, cause, and effect, are the stock in trade of the practicing physician. The growth of specialization does not disqualify a general practitioner from signalizing the existence of an infection in a patient's body merely because he is not a specialist on that part of the body where the infection exists. The trial court, therefore, committed error in holding that Dr. Webb was not qualified to testify as to the location of plaintiff's infection and to its probable time of origin.

The majority opinion holds that even if it were error to exclude Dr. Webb's testimony, it would not be prejudicial since Dr. Webb testified in reply to the one question he was permitted to answer over defendant's objection that he believed the infection was carried into the urinary tract by the

examination. Defendant contends that the witness's answers to the other questions would have been merely reiterative of the reply to the first. The record does not support that contention.

It is true that Dr. Webb stated at the close of a lengthy answer to an even lengthier question that he believed the infection was carried into the urinary tract by the examination. This testimony was essential to plaintiff's case. It was also essential that plaintiff negative the possible causes of the infection suggested by defendant and his expert witnesses. The testimony excluded by the trial court would have constituted evidence by a qualified expert that the infection could not have been caused by the conditions relied upon by defendant. Plaintiff was entitled to have that evidence considered by the jury in opposition to the testimony of defendant's expert witnesses, and it was prejudicial error to deprive him of such evidence. Moreover, even as to the one question that Dr. Webb was permitted to answer, the prejudicial effect of the ruling is clearly apparent. The manner in which the trial court informed the jury that Dr. Webb was qualified to answer only one question indicated a low degree of belief in the witness's qualification,[1] and obviously had its effect upon the jury's consideration of the weight to be given that testimony. There is no doubt that considerations of lack of expertness are properly presented to the jury to govern the weight to be given the testimony. (*McGhee* v. *Raritan Copper Works*, 133 N.J.L. 376, 377 [44 A.2d 388] ; *Salmon* v. *Rathjen*, 152 Cal. 290, 299 [92 P. 733].) These considerations were properly raised by opposing counsel on cross-examination, but the trial court added strength to the argument of defense counsel by the manner of its ruling. It would be an extremely independent jury that, notwithstanding the cumulative effect of these several erroneous rulings, would choose to believe plaintiff's witness. Plaintiff was entitled to have his case stand or fall on its own merits, and insofar as the rulings of the trial court prevented its consideration thereon, the error was prejudicial.

Finally, it is contended that the extent of examination of an expert witness is within the discretion of the trial court and that its ruling will not be disturbed on appeal. The trial court, however, is not a final judge of the qualifications of

---

[1] "I am allowing him to answer that one question only that I think he is qualified to answer, and you will give it that belief to which you believe that it is entitled."

an expert witness. Its ruling upon those qualifications is reviewable to determine whether there has been an abuse of discretion. The exclusion of a qualified expert because of an erroneous view of his qualifications is, as a matter of law, an abuse of discretion requiring reversal. (*Meiselman* v. *Crown Heights Hospital*, 285 N.Y. 389, 399 [34 N.E.2d 367] ; *Johnson* v. *Winston*, 68 Neb. 425, 430 [94 N.W. 607] ; 7 Wigmore, Evidence, § 2090, p. 454.)

Plaintiff produced a competent medical witness to testify to matters within the knowledge of all competent medical practitioners. This much he was properly required to do. In erroneously excluding that witness's relevant testimony the trial court abused its discretion and effectively denied plaintiff a fair opportunity to prove his case. (*Meiselman* v. *Crown Heights Hospital*, 285 N.Y. 389, 399 [34 N.E.2d 367].) I would therefore reverse the judgment.

Gibson, C. J., and Carter, J., concurred.

The opinion was modified to read as above and appellant's petition for a rehearing was denied January 12, 1950. Carter, J., and Traynor, J., voted for a rehearing.